Daniel Cooper (SBN 153576)
daniel@sycamore.law
Jesse C. Swanhuyser (SBN 282186)
jesse@sycamore.law
Jessica D. Hollinger (SBN 344211)
jessica@sycamore.law
SYCAMORE LAW, INC.
1004 O'Reilly Avenue
San Francisco, CA 94129
Tel: (415) 360-2962

Barak Kamelgard (SBN 298822)
Barak@lawaterkeeper.org
Benjamin Harris (SBN 313193)
Ben@lawaterkeeper.org
LOS ANGELES WATERKEEPER
360 E 2nd Street, Suite 250
Los Angeles, CA 90012
Tel: (310) 394-6162
Fax: (310) 394-6178

Attorneys for Plaintiff
LOS ANGELES WATERKEEPER

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER, a public benefit non-profit corporation,<br><br>        Plaintiff,<br><br>     vs.<br><br>ROYAL WHITE CEMENT INC., an Illinois corporation,<br><br>        Defendant. | Case No. _____<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES<br><br>Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387 |

# I. JURISDICTION AND VENUE

1. This is a civil action brought under the citizen suit provisions of the Federal Water Pollution Control Act ("Clean Water Act" or "Act"), 33 U.S.C. § 1251 *et seq*.

2. This Court has subject matter jurisdiction over Los Angeles Waterkeeper ("LA Waterkeeper" or "Plaintiff") and Royal White Cement Inc. ("Royal White" or "Defendant") (collectively the "Parties") and over the subject matter of this action pursuant to section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

3. This complaint ("Complaint") seeks relief for ongoing violations by Royal White of the Clean Water Act, and the terms and conditions of the *National Pollutant Discharge Elimination System Permit No. CA S000001, State Water Resources Control Board Water Quality Order No. 91-13-DWQ*, as amended by *Water Quality Order No. 92-12-DWQ, Water Quality Order No. 97-03-DWQ, Order No. 2014-0057-DWQ,* and as amended on November 6, 2018 ("General Permit"), related to polluted storm water and non-storm water discharges from the industrial facility owned and operated by Royal White at 645 N. Pioneer Avenue, Wilmington, California 90744 ("Facility").

4. The relief requested is authorized pursuant to 28 U.S.C. §§ 2201–2202 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration) and 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief and civil penalties).

5. Prospective citizen plaintiffs must, as a jurisdictional prerequisite to

enforcing the Clean Water Act in Federal District Court, prepare a Notice of Violation and Intent to File Suit letter ("Notice Letter") containing, *inter alia*, sufficient information to allow the recipient to identify the standard, limitation, or order alleged to be violated, the activity alleged to constitute the violations, the location of alleged violations, and the date or dates of such violations. 33 U.S.C. § 1365(a); 40 C.F.R. § 135.3(a).

6.     The Notice Letter must be sent via certified mail at least sixty (60) days prior to filing a complaint ("Notice Period") to the owner of the facility alleged to be in violation of the Act and, where the alleged violator is a corporation, to the corporation's registered agent for service of process. 33 U.S.C. § 1365(b); 40 C.F.R. § 135.2(a)(1).

7.     A copy of the Notice Letter must be mailed to the Attorney General, U.S. Department of Justice ("U.S. DOJ"), the Administrator of the U.S. Environmental Protection Agency ("U.S. EPA"), the Regional Administrator of the U.S. EPA for the region in which a violation is alleged to have occurred, and the chief administrative officer for the water pollution control agency for the State in which the violation is alleged to have occurred. 33 U.S.C. § 1365(b); 40 C.F.R. § 135.2(b)(1)(A).

8.     On August 21, 2023, LA Waterkeeper sent a Notice Letter via certified mail to Royal White and its registered agent for service of process. The Notice Letter described ongoing violations of the Act and General Permit at the Facility, and provided notice of LA Waterkeeper's intention to file suit against Defendant at the expiration of the Notice Period. A true and accurate copy of the Notice Letter as provided to Royal White is attached to, and incorporated by reference into, this

Complaint at EXHIBIT 1.

9. More than sixty (60) days have passed since the Notice Letter was served on Royal White, and the State and Federal agencies.

10. Neither the U.S. EPA nor the State of California has commenced or is diligently prosecuting a court action to redress violations alleged in the Notice Letter and this complaint.

11. LA Waterkeeper's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the Act. 33 U.S.C. § 1319(g).

12. Venue is proper in the Central District of California pursuant to section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

LA Waterkeeper, by and through its counsel, hereby alleges:

## II.  **<u>INTRODUCTION</u>**

13. This Complaint seeks relief for unpermitted and unlawful discharges of pollutants, polluted storm water, and polluted non-storm water from the Facility to waters of the United States in violation of the Act and General Permit.

14. Specifically, this Complaint alleges that the Facility has discharged and continues to discharge pollutants to waters of the United States without National Pollution Discharge Elimination System ("NPDES") permit authorization, in violation of section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a).

15. With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations, like those conducted by Royal White, flow into Los Angeles's storm drains and contaminate local streams, creeks,

rivers, estuaries, harbors, bays, beaches, and coastal waters.

16. The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering local creeks and rivers each year. *See*, *e.g.*, Steven Bay et al., *Study of the Impact of Stormwater Discharge on Santa Monica Bay* (1999).

17. Numerous scientific studies in recent decades have documented serious health risks to recreational users of Southern California's waters from pollutant-loaded storm water and non-storm water discharges. *See*, *e.g.*, Michael K. Stenstrom, *Southern California Environmental Report Card: Stormwater Impact* 15 (1998); Los Angeles County Grand Jury, *Reducing the Risks of Swimming at Los Angeles County Beaches* 205 (2000).

18. Los Angeles' waterways, including the Consolidated Slip, Greater Los Angeles/Long Beach Harbor Waters, San Pedro Bay, and connected coastal and ocean waters, are ecologically sensitive areas, and are essential habitat for dozens of cetacean, pinniped, fish, bird, macro-invertebrate, and invertebrate species.

19. Los Angeles' waterways provide numerous recreational activities, including swimming, surfing, SCUBA diving, and kayaking.

20. Los Angeles' waterways also provide non-contact recreation, aesthetic, and spiritual opportunities, such as hiking, running, biking, and wildlife observation.

21. Industrial facilities, like Royal White's, that discharge storm water and non-storm water contaminated with aluminum, copper, zinc, total suspended solids, nitrate plus nitrite nitrogen ("N+N"), chemical oxygen demand, iron, magnesium, and pH, and other pollutants contribute to the impairment of surface waters and aquatic

dependent wildlife, expose people to toxins, and harm the special social and economic benefits Los Angeles' waterways have for locals and visitors alike.

22. These contaminated discharges can and must be controlled as required by the CWA for ecosystems to regain their health and to protect public health.

23. Controlling polluted storm water and non-storm water discharges associated with industrial activity is vital to protecting Southern California's surface and coastal waters, and essential to LA Waterkeeper's mission.

24. Royal White is liable under the CWA for its past and ongoing failures to comply with the Act, including its failure to enroll in the General Permit or any individual NPDES permit, as well as failures to comply with EPA-approved effluent limitation guidelines, the General Permit's discharge prohibitions, technology-based and water quality-based effluent limitations, planning and monitoring requirements, remedial action requirements, and other procedural and substantive requirements. *See* 33 U.S.C. §§ 1342, 1365.

25. Royal White is liable for daily, date-specific, monthly, and annual violations of the General Permit since at least August 21, 2018. *See* 33 U.S.C. §§ 1311(a), 1319(d); 40 C.F.R. § 19.4.

**III.    THE PARTIES**

**A.    LA Waterkeeper**

26. LA Waterkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its main office located at 360 East 2nd Street, Suite 250, Los Angeles, California 90012.

27. Founded in 1993, LA Waterkeeper is dedicated to the preservation,

protection, and defense of the inland and coastal surface and ground waters of Los Angeles County. LA Waterkeeper's mission is to fight for the health of the region's waterways, and for sustainable, equitable, and climate-friendly water supplies.

28. The organization works to achieve this goal through education, outreach, advocacy, and, where necessary, litigation and enforcement actions under the Clean Water Act on behalf of itself and its members.

29. LA Waterkeeper members live, work, and recreate in and around the Los Angeles basin, and include many who live and/or recreate in and around the Consolidated Slip, Greater Los Angeles/Long Beach Harbor Waters, San Pedro Bay, as well as the beaches and nearshore and coastal waters of the Pacific Ocean between Santa Monica and Huntington Beach (collectively, the "Receiving Waters").

30. LA Waterkeeper members use and enjoy the Receiving Waters to fish, surf, swim, sail, SCUBA dive, kayak, bird/wildlife watch, bike, run, hike, and walk. LA Waterkeeper members also use the Receiving Waters to engage in education and scientific study through pollution and habitat monitoring and restoration activities.

31. The Facility's unlawful and unpermitted discharge of pollutants into the Receiving Waters, and failure to comply with the General Permit's non-discharge mandates, degrade the quality of the Receiving Waters and pose risks to human health and aquatic life, harming LA Waterkeeper's members and impairing their ability to use and enjoy these waters for recreational, aesthetic, spiritual, and other activities.

32. The interests of LA Waterkeeper and its members, therefore, have been, are being, and will continue to be adversely affected by the Facility's failure to comply with the Act and General Permit.

33.     Continuing commission of the acts and omissions alleged herein will irreparably harm LA Waterkeeper and its members, for which harm they have no plain, speedy, or adequate remedy at law.

34.     The relief sought herein will redress the harms to LA Waterkeeper caused by Royal White's activities.

**B.     Owner and/or Operator of the Facility**

35.     Royal White incorporated in Illinois on November 22, 1999, and filed a Statement and Designation by a Foreign Corporation with California's Secretary of State on October 31, 2005.

36.     The company's most recent Statement of Information, filed September 27, 2022, lists the company's principal address as 14061 Bellaire Boulevard in Houston, Texas 77083 and its California office as 645 North Pioneer Avenue, Wilmington, California 90744.

37.     The Statement of Information designates Marcel Fadi of 8316 East Freeway, Houston, Texas 77029 as the company's chief executive officer and Mark Fady of 19067 Reyes Street in Rancho Dominguez, California 90221 as the company's agent for service of process.

38.     According to the company's website, Royal White operates eight terminals in the United States, which collectively receive, process, and distribute approximately 532,000 tons per year of bulk and packaged cement products, including "a variety of portland cements, blended cements and masonry cements, as well as supplementary cementitious materials like slag cement and fly ash."

39.     Royal White owns and operates a 40,000 square foot industrial facility at

1  645 North Pioneer Avenue, Wilmington, California 90744 with an annual output

2  capacity of 50,000 tons.

3        40.    Industrial activities conducted at the Facility include, but are not limited

4  to, transportation, handling, processing, and storage of raw materials, intermediate and

5  final products, and waste materials used in or derived from the manufacture of

6  cement.

7        41.    These activities are conducted in both covered and uncovered areas at the

8  Facility.

9        42.    The Facility's industrial operations result in the accumulation of

10  cementitious material throughout its outdoor areas and on public streets (see photos),

11  as well as on roofs and in neighboring properties, including residences.

**IMAGE 1**
NORTH ENTRANCE TO THE FACILITY FROM NORTH PIONEER AVENUE
(Google Street View, image capture February 2022)



//
//
//

| | |
|---|---|
| **IMAGE 2** | |
| "PHOTOGRAPH 12: WHITE CEMENT VISIBLE ON GROUND OF THE FACILITY" | |
| (LARWQCB Inspection Report, Aug. 18, 2023) | |



| | |
|---|---|
| **IMAGE 3** | |
| "WHITE CEMENT MIXED WITH WATER AT THE ENTRANCE OF THE FACILITY" | |
| (LARWQCB Inspection Report, Aug. 24, 2023) | |



| IMAGE 4 |
|---|
| "WHITE CEMENT LEADING UP TO THE STORM DRAIN INLET"<br>(LARWQCB Inspection Report, Aug. 24, 2023) |



43.     During storm events, these accumulations of dust and particulate are discharged as dissolved and suspended pollutants in storm water to North Pioneer Avenue, and flow into a municipal storm drain, which conveys the pollutants to the Receiving Waters (see storm drain map below).

| IMAGE 5<br>GOOGLE EARTH IMAGE SHOWING PROXIMITY TO CONSOLIDATED SLIP/INNER HARBOR<br>(Facility indicated in white) | IMAGE 6<br>SCREEN CAPTURE FROM COUNTY OF LOS ANGELES ONLINE MS4 MAPPING TOOL<br>(Facility indicated in red) |
|---|---|



44.     The Facility's industrial activities fall within the definitions of 40 C.F.R. Chapter I, Subchapter N ("Subchapter N"), Part 411 (cement manufacturing materials storage piles) and Standard Industrial Classification ("SIC") SIC code 3241 (manufacturing hydraulic cement, including portland, natural, masonry, and pozzolana cements).

45.     According to publicly available information, including the State Board's online database for NPDES program compliance filings (Storm Water Multiple Application and Report Tracking System ("SMARTS")), the Facility has never filed an NOI or otherwise enrolled in an NPDES permit since beginning industrial activities.

46.     As of August 29, 2023, SMARTS lists the Facility as a "Nonfiler," with the status "NOI required."

## IV.     LEGAL BACKGROUND

### A.     The Clean Water Act

47.     The Act is the primary federal statute regulating the protection of the nation's water. The Act aims to prevent, reduce, and eliminate pollution in the nation's water in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

48.     "To achieve its objectives, the [A]ct is based on the concept that all discharges into the nation's waters are unlawful, unless specifically authorized by a permit[.]" Congressional Research Service, Report RL30030.

49.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with other enumerated sections of the Act, including prohibition of

discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to section 402. *Id*. §§ 1311, 1342(b); *see also* General Permit, § I.A.12.

50. The Act requires all point source discharges of pollutants to waters of the United States be regulated by an NPDES permit. 33 U.S.C. § 1311(a); 40 C.F.R. § 122.26(c)(1).

51. Section 402(p) of the Act establishes a framework regulating industrial storm water discharges under federal and authorized state NPDES permit programs. 33 U.S.C. § 1342(p).

52. Section 402(b) of the Act allows each state to administer an NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water, approved by the U.S. EPA. *Id*. § 1342(b).

53. States with approved NPDES permit programs are authorized by section 402(b) to regulate industrial storm water discharges through the issuance of a statewide general NPDES permit applicable to all industrial dischargers and/or through individual NPDES permits issued to dischargers. 33 U.S.C. § 1342(b).

54. The relevant NPDES permit in this action is California's General Permit, which is issued by the State Water Resources Control Board ("State Board") and implemented and enforced by Regional Board Water Quality Control Boards, including the Los Angeles Regional Water Quality Control Board ("Regional Board").

55. All unpermitted discharges of polluted storm water "associated with industrial activity" are violations of the Act. 33 U.S.C. § 1342(b)(2)(B).

56.    Categories of facilities considered to be engaging in industrial activity include, without limitation, those defined Subchapter N, including Part 411, and facilities assigned specified SIC codes, including 3241. See 40 C.F.R. § 122.26(B)(14)(i)–(ii).

57.    Section 505(a)(1) of the Act provides for citizen enforcement against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. § 1365(a)(1), (f).

58.    The Act is a strict liability statute. *NRDC v. Los Angeles County,* 725 F.3d 1194, 1204–1205 (9th Cir. 2013); *Baykeeper v. Int'l Metals Ekco, Ltd.*, 619 F. Supp. 2d 936, 940 (C.D. Cal. 2009), *citing Hawaii's Thousand Friends v. City & Cty. of Honolulu*, 821 F. Supp. 1368, 1392 (D. Haw. 1993).

59.    "Effluent standard or limitation" is defined to include: (a) the prohibition in section 301(a) against unpermitted discharges; (b) an ELG prescribed in Subchapter N; and/or (c) a condition of an NPDES permit such as the General Permit. *Id.* § 1365(f); *see also id*. §§ 1311(a), 1314(b), 1342.

60.    A "person" under the Act includes individuals, corporations, partnerships, associations, States, municipalities, commissions, and political subdivisions of a State, or any interstate body. *Id.* § 1362(5).

61.    Each violation of any term or condition in an NPDES permit is an independent violation of the Act. 33 U.S.C. § 1319(d). Each separate violation of the Act subjects the violator to a penalty of up to $64,618.00 per day per violation for violations occurring after November 2, 2015, where penalties are assessed on or after

1
January 6, 2023. *Id.* §§ 1319(d), 1365(a); 40 C.F.R. § 19.4 (Adjustment of Civil

Monetary Penalties for Inflation).

62.     Section 505(d) of the Act allows a prevailing or substantially prevailing

party to recover litigation costs, including fees for attorneys, experts, and consultants

where the court finds that such an award is appropriate. 33 U.S.C. § 1365(d); *see also*

*St. John's Organic Farm v. Gem County Mosquito Abatement Dist.*, 574 F.3d 1054,

1062–64 (9th Cir. 2009) (holding that the court's discretion to deny a fee award to a

prevailing plaintiff is narrow, and denial is "extremely rare.").

### B. EPA-Approved Effluent Limitation Guidelines

63.     Facilities subject to subchapter N must comply with specific EPA-

approved Effluent Limitation Guidelines ("ELGs") and all federal and state NPDES

permits must be conditioned upon compliance with them, unless more stringent

requirements apply. 40 C.F.R. §§ 401.10, 122.26(b)(14)(i); *see also* 33 U.S.C. § 1314.

64.     40 C.F.R. Chapter I, Subchapter N defines twelve categories of industry

that are subject to specific EPA-approved Effluent Limitation Guidelines ("ELGs");

All qualifying point sources must comply with the ELGs, and all federal and state

NPDES permits must be conditioned upon compliance with them, unless more

stringent requirements apply. 40 C.F.R. § 401.10; *see also* 40 C.F.R. §§

122.26(b)(14)(i), 123.25(a)(9).

65.     Subchapter N, Part 411 applies to "Cement Manufacturing Point

Source[s]" and Subpart C to Part 411 specifically addresses "Materials Storage Piles

Runoff," as defined by 40 C.F.R. § 411.30. Materials Storage Piles Runoff

encompasses "discharges resulting from the runoff of rainfall which derives from the

storage of materials including raw materials, intermediate products, finished products and waste materials which are used in or derived from the manufacture of cement." 40 C.F.R. § 411.30.

66. Part 411, Subpart C imposes the following requirements:

(a) Subject to the provisions of paragraph (b), the following limitations establish the quantity or quality of pollutants or pollutant properties permitted to be discharged by a point source after application of the best conventional pollutant control technology.

**TABLE 1**
ELGs APPLICABLE TO THE FACILITY'S DISCHARGES

| *Effluent characteristic* | *Effluent limitations* |
|---|---|
| TSS | Not to exceed 50 mg/L |
| pH | Within the range 6.0–9.0 s.u. |

(b) Any untreated overflow from facilities designed, constructed and operated to treat the volume of runoff from materials storage piles which results from a 10-year, 24-hour rainfall event shall not be subject to the pH and TSS limitations stipulated in paragraph (a) of this section. 40 C.F.R. § 411.37.

67. For facilities subject to Subchapter N, the General Permit provides that "compliance with the BAT/BCT and ELG requirements constitutes compliance with technology-based requirements of this General Permit." General Permit § I.L.72.

### C. California's Storm Water Permit

68. California is authorized by U.S. EPA to issue NPDES permits for storm water discharges associated with industrial activities. U.S. EPA, *NPDES State Program Authority*, https://www.epa.gov/npdes/npdes-state-program-authority (last updated on Jan. 3, 2023); *see* 33 U.S.C. § 1342(b); 40 C.F.R. § 122.28(a).

69.    The State Board is charged with regulating pollutants to protect California's water resources, Cal. Water Code § 13001, and is designated as the state agency for all purposes stated in the CWA, *id.* § 13160(a).

70.    In order to discharge storm water lawfully in California, certain categories of industrial dischargers must apply for, and obtain coverage under the General Permit by submitting a Notice of Intent to the State Board, and comply with all of its terms. 33 U.S.C. § 1311(a); 40 C.F.R. § 122.26(c)(1); *see also* General Permit, § I.A.12.

71.    The Notice of Intent serves as certification to the State of California that the industrial facility owner(s), operator(s), and/or agent(s) have read the General Permit and will comply with all its terms and conditions.

72.    Attachment A to the General Permit, which defines covered facilities, requires enrollment for all "Facilities Subject To Storm Water Effluent Limitations Guidelines, New Source Performance Standards, or Toxic Pollutant Effluent Standards Found in 40 Code of Federal Regulations, Chapter I, Subchapter N."

73.    Additionally, facilities undertaking industrial activities classified under Standard Industrial Classification code 3241 are required to obtain coverage under the General Permit. General Permit, § I.A.12; General Permit, Attachment A, § 2.

74.    Compliance with the General Permit constitutes compliance with the Clean Water Act for purposes of storm water discharges. 33 U.S.C. § 1311(b)(2)(A), (E).

75.    Conversely, "[General] Permit noncompliance constitutes a violation of the Clean Water Act and the [California] Water Code." General Permit, § XXI.A; *see*

*also* General Permit, § I.A.8 ("This General Permit authorizes discharges of industrial storm water [] so long as those discharges comply with all requirements, provisions, limitations, and prohibitions in this General Permit.").

76.　　Permittees that fail to comply with the terms and conditions of the General Permit, therefore, are liable for violations of the Act. *Nw. Envtl. Advocates. v. City of Portland*, 56 F.3d 979, 986 (9th Cir. 1995) ("[T]he plain language [of the CWA] authorizes citizens to enforce all permit conditions."); *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1151 (9th Cir. 2000) (finding that "the Clean Water Act allows citizen suits based on violations of any conditions of an NPDES permit, even those which are purely procedural.").

77.　　Industrial facilities discharging storm water without coverage under the General Permit are liable under the Act for unpermitted discharges for every day of significant rainfall.

78.　　On information and belief, Royal White does not have and has never had, nor has it ever submitted an application for, a NPDES permit for the discharge of pollutants to waters of the United States. Storm water discharges containing pollutants from the Facility are, therefore, unpermitted.

79.　　Royal White is liable for past and ongoing violations of the General Permit, and civil penalties and injunctive relief are available remedies. 33 U.S.C. §§ 1311(a), 1319(d); *see also* 40 C.F.R. § 19.4.

**C.　　The General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations**

80.　　The General Permit contains the following three sections restricting the

discharge of pollutants in storm water from the Facility: (1) discharge prohibitions; (2) technology-based effluent limitations; and (3) water quality-based effluent limitations.

### 1. Discharge Prohibitions

81.     The General Permit's Discharge Prohibitions include the prohibition of any "discharges of liquids or materials other than storm water" (e.g., vehicle or building wash water, industrial particulates, water used for dust suppression, chemical spills, trash) not otherwise authorized by another NPDES permit, either directly or indirectly to waters of the United States. General Permit, § III.B.

82.     The General Permit's Discharge Prohibitions also prohibit storm water discharges and authorized non-storm water discharges that contain pollutants that cause or threaten to cause pollution, contamination, or nuisance as defined in section 13050 of California Water Code. General Permit, § III.C.

83.     The General Permit's Discharge Prohibitions further prohibit discharges that violate any discharge prohibitions contained in any applicable Regional Water Board Water Quality Control Plans, or any statewide water quality control plans and policies. General Permit, § III.D.

### 2. Technology-Based Effluent Limitations

84.     The General Permit contains technology-based effluent limitations that set the floor for pollution reduction, i.e., the minimum level of pollution reduction that must be achieved by all permittees, regardless of the quality of water to which a permittee facility discharges. General Permit, § V; *see also* General Permit, Fact Sheet § II.D.31 ("[Clean Water Act] Section 301(b)(1)(A) requires that discharges from existing facilities must, *at a minimum*, comply with technology-based effluent

limitations based on the technological capability of Dischargers to control pollutants in their discharges." (emphasis added)).

85.  The General Permit's technology-based effluent limitations require permittee facilities to reduce or prevent pollutants in storm water discharges through the implementation of pollution controls that achieve the Best Available Technology Economically Achievable ("BAT") in the industry for toxic or non-conventional pollutants, and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. General Permit, § V.A, Fact Sheet § II.D.5; *see* 40 C.F.R. §§ 401.15–.16 (listing conventional and toxic/non-conventional pollutants).

86.  Compliance with the General Permit's technology-based effluent limitations requires permittees to design and implement effective, site-specific pollution control strategies called Best Management Practices ("BMPs") that prevent or reduce storm water discharges consistent with BAT/BCT pollution reduction industry standards. General Permit, § V.A; General Permit, Fact Sheet § II.D.5 ("Dischargers must implement BMPs that meet or exceed the BAT/BCT technology-based standard.").

87.  Best Management Practices are schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of waters of the United States. Best Management Practices include treatment systems, operation procedures, and processes to control and abate the discharge of pollutants from the Facility. 40 C.F.R. § 122.2.

88.  Permittees must design Best Management Practices that meet the BCT standard for all sources of conventional pollutants, including total suspended solids,

oil and grease, and pH. General Permit, Fact Sheet § I.B; 33 U.S.C. § 1311(b)(1)(A); *see* 40 C.F.R. § 401.16 (listing conventional pollutants).

89.     Permittees must thereafter implement and maintain, as well as evaluate and improve, their Best Management Practices to ensure that the concentration of conventional pollutants in any storm water discharge is controlled consistent with the BCT standard. General Permit, Fact Sheet § II.D.5.

90.     Permittees must design Best Management Practices that meet the BAT standard for all sources of toxic pollutants. General Permit, Fact Sheet § I.B; 33 U.S.C. § 1311(b)(2)(A); *see* 40 C.F.R. § 401.15 (listing toxic pollutants).

91.     Permittees must implement and maintain, as well as evaluate and improve, those Best Management Practices to ensure that the concentration of any toxic pollutant in any storm water discharge is reduced consistent with the BAT standard. General Permit, Fact Sheet § II.D.5.

92.     Multiple pollutants discharged and/or emitted, or potentially discharged/emitted, from the Facility are classified as toxic pollutants pursuant section 307(a)(1) of the Act including, without limitation, lead, arsenic, cadmium, chromium, and benzene. *See* 40 C.F.R. § 401.15.

93.     The 2008, 2015, and 2021 versions of U.S. EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities include numeric standards called benchmark pollutant concentrations for industrial storm water discharges ("U.S. EPA Benchmarks"). U.S. EPA, National Pollutant Discharge Elimination System (NPDES) Multi-Sector General Permit (MSGP) for Storm Water Discharges Associated with Industrial Activity § 4.2.2 (as modified Mar. 1, 2021).

94.     U.S. EPA Benchmarks are objective numeric standards for evaluating whether the Best Management Practices designed and implemented at a facility achieve the statutory BAT/BCT standard. *See* 80 Fed. Reg. 34403, 34405 (June 16, 2015); *see also* 73 Fed. Reg. 56572, 56574 (Sept. 29, 2008); 65 Fed. Reg. 64746, 64766–64767 (Oct. 30, 2000).

95.     Discharges of storm water containing pollutant concentrations exceeding U.S. EPA Benchmarks evidence a failure to develop and implement pollution control strategies that achieve BAT/BCT-level pollutant reductions. *See Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914, 921–25 (C.D. Cal. 2009); *see also* 80 Fed. Reg. 34403, 34405 (June 16, 2015).

96.     Table 2 contains some of the U.S. EPA Benchmarks relevant to the assessing the Facility's compliance with the BAT/BCT standard.

**TABLE 2**
U.S. EPA BENCHMARKS APPLICABLE TO THE FACILITY'S DISCHARGES

| Pollutant | 2015 Benchmark | 2021 Benchmark |
|---|---|---|
| TSS | 100 mg/L | 100 mg/L |
| copper | 0.0048 mg/L | 0.0048 mg/L |
| lead | 0.21 mg/L | 0.21 mg/L |
| zinc | 0.09 mg/L | 0.09 mg/L |
| N+N | 0.68 mg/L | 0.68 mg/L |
| magnesium | 0.064 mg/L | n/a |
| iron | 1.0 mg/L | n/a |
| aluminum | 0.75 mg/L | 1.1 mg/L |
| pH | 6.0–9.0 s.u. | 6.0–9.0 s.u. |
| COD | 120 mg/L | 120 mg/L |
| arsenic | 0.069 mg/L | 0.069 mg/L |
| cadmium | 0.04 mg/L | 0.033 mg/L |
| BOD | 30 mg/L | 30 mg/L |

97.     Records of visual observations required to be maintained by the General Permit are relevant to assessing a permittee's compliance with the BAT/BCT

standard.

98.     Best practices within an industrial category, and/or implemented at similar industrial facilities, are relevant measures for evaluating whether a permittee's Best Management Practices comply with the BAT/BCT standard.

### 3. Water Quality-Based Effluent Limitations

99.     In addition to complying with the General Permit's technology-based effluent limitations, permittees are required to meet "any more stringent [water quality-based limitations] necessary for receiving waters to meet applicable water quality standards." General Permit, § I.D.31; *see also* 33 U.S.C. § 1311(b)(1)(C).

100.     Unlike the General Permit's technology-based effluent limitations, compliance with water quality-based effluent limitations, known as "Receiving Water Limitations," depends on the status of surface waters receiving a given facility's storm water discharge.

101.     Receiving Water Limitations are intended to protect designated beneficial uses of surface waters to which a facility discharges storm water. General Permit, § VI.A.

102.     Beneficial uses of the Receiving Waters are defined in the *Water Quality Control Plan – Los Angeles Region: Basin Plan for the Coastal Watersheds of Los Angeles and Ventura Counties* ("Basin Plan"), promulgated by the California Regional Water Quality Control Board, Los Angeles Region 4 and most recently amended February 13, 2020.

103.     Existing and potential designated beneficial uses of the Los Angeles-Long Beach Inner Harbor include: Industrial, Navigation, Commercial, Maritime,

Water Contact Recreation, Non-Contact Water Recreation, Rare, Threatened, or Endangered Species, and Shellfish Habitat. *See* Basin Plan, Table 2-3, 2-3(a).

104.   Storm water and non-storm water contaminated with sediment, heavy metals, and other pollutants harm the environmental, social, and economic values of the Receiving Waters.

105.   Under federal law, the combination of a designated beneficial use and the water quality objective (or criterion) set to protect the use results in a "water quality standard." 40 C.F.R. § 131.3(i).

106.   The General Permit contains three Receiving Water Limitations. General Permit, § VI.A–C.

107.   The first Receiving Water Limitation prohibits discharges of storm water associated with industrial activity that causes or contributes to an exceedance of any applicable water quality standards ("WQSs"). General Permit, § VI.A; *see also Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1166–1167 (9th Cir. 1999) (holding that industrial storm water discharges must strictly comply with water quality standards).

108.   Storm water discharges with pollutant concentrations that cause or contribute to an exceedance of any applicable water quality standards are violations of the General Permit and the Act.

109.   The General Permit's second water quality-based effluent limitation is that pollutant concentrations in storm water discharges shall "not adversely impact human health or the environment." General Permit, § VI.B.

110.   Storm water discharges with pollutant concentrations that adversely

impact human health or the environment are violations of the General Permit and the Act.

111. The General Permit's third Receiving Water Limitation is that concentrations of pollutants in storm water discharges shall not threaten to cause pollution or a public nuisance. General Permit, § VI.C.

112. Storm water discharges with pollutant concentrations that threaten to cause pollution or a public nuisance are violations of the General Permit and the Act.

a. Water Quality Standards Applicable to the Facility

113. Water quality standards applicable to the Receiving Waters include without limitation:

(1) the numeric aquatic life and human health criteria set out in the California Toxics Rule ("CTR"), 40 C.F.R. 131.38, *see also* 65 Fed. Reg. 31712 (May 18, 2000), which apply to the Receiving Waters except for impairments/pollutants being addressed by a TMDL or similar instrument (e.g., Site Specific Objectives);

(2) all numeric objectives contained in the Basin Plan or subsequent amendments (e.g., "The pH of bays or estuaries shall not be depressed below 6.5 or raised above 8.5 as a result of waste discharges." Basin plan at 3-40.);

(3) all narrative objectives contained in the Basin Plan or subsequent amendments (e.g., "[a]ll waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in human, plant, animal, or aquatic life." Basin Plan at 3-38).

114. The California Toxics Rule sets numeric criteria for 23 priority toxic pollutants to protect aquatic life and for 57 priority toxic pollutants to protect human

health based on the U.S. EPA Administrator's determination that such numeric criteria are necessary in the State of California to protect human health and the environment. 65 FR 31681 (May 18, 2000); *see also* 40 C.F.R. § 131.2 ("Such standards [] serve as the regulatory basis for the establishment of water quality-based treatment controls and strategies beyond the technology-based levels of treatment required by sections 301(b) and 306 of the Act."

**TABLE 3**
CTR "END-OF-PIPE" LIMITS APPLICABLE TO THE FACILITY'S DISCHARGES

| Pollutant | Criterion Max. Concentration (Saltwater) |
|---|---|
| arsenic | 0.069 mg/L |
| cadmium | 0.042 mg/L |
| copper | 0.0048 mg/L |
| hexavalent chromium | 1.1 mg/L |
| lead | 0.21 mg/L |
| zinc | 0.09 mg/L |

115. In California law, "water quality objectives" are the numeric or narrative water quality levels established for the "reasonable protection of the beneficial uses and the prevention of nuisance." Cal. Water Code § 13050(h).

116. Surface waters that cannot support designated beneficial uses due to instream exceedances of a water quality standard are deemed impaired water bodies pursuant to section 303(d) of the Clean Water Act and placed on the "303(d) List." *See* 33 U.S.C. § 1313(d).

117. According to the State Board's 2020–2022 Integrated 303(d) List of Impaired Water Bodies, the Consolidated Slip is impaired for chromium, toxaphene (tissue), zinc (sediment), mercury (sediment), copper (sediment), phenanthrene, dieldrin, chlordane (tissue & sediment), cadmium (sediment), 2-methylnaphthalene,

benzo(a)anthracene, benthic community effects, pyrene, chrysene (C1-C4), DDT (tissue & sediment), toxicity, benzo(a)pyrene, PCBs (tissue & sediment), and lead (sediment).

118. The Draft 2024 Integrated 303(d) List of Impaired Water Bodies recommends the addition of Dichlorodiphenyldichloroethylene ("DDE"), copper (water), zinc (water) to Consolidated Slip's impairments.

119. Once placed on the 303(d) List, the CWA requires the U.S. EPA or the state to prepare a total daily maximum load ("TMDL") designed to restore the water quality in a water body (or segment) to support designated beneficial uses. 33 U.S.C. § 1313.

120. On May 5, 2011, the LA Regional Board approved an Amendment to the Basin Plan to incorporate the Total Maximum Daily Load for Toxic Pollutants in Dominguez Channel and Greater Los Angeles and Long Beach Harbor Waters ("Dominguez/Harbor Waters TMDL").

121. "The goal of the Dominguez/Harbor Waters TMDL is to protect and restore fish tissue, water and sediment quality [] by remediating contaminated sediment and controlling the sediment loading and accumulation of contaminated sediment in the Harbors." L.A. Reg'l Bd., Resol. No. R11-008 (May 5, 2011), Attach. A at 2.

122. A TMDL specifies the maximum amount of a pollutant that a waterbody (or segment) can receive and still meet water quality standards, and then allocates pollutant loadings to point and non-point sources, as waste load allocations ("WLAs") and load allocations ("LAs") respectively.

123. TMDLs assign WLAs to "Responsible Parties," which include "Individual and General Stormwater Permit Enrollees," e.g., industrial facilities subject to the General Permit.

124. The General Permit must contain "effluent limits [that] are consistent with the assumptions and requirements of any available wasteload allocation for the discharge." 40 C.F.R. § 122.44(d)(1)(vii)(B).

125. In 2018, the State Board re-opened the General Permit "to amend Attachment E [and] the Fact Sheet [to incorporate enforceable] TMDL-specific [] requirements," including Numeric Effluent Limitations ("NELs") set in the Ballona Creek Metals TMDL. General Permit § I.F.42; *see also* General Permit Fact Sheet § II.F.6.h.xi.

126. The amendment includes the interim and final requirements derived from the Dominguez/Harbor Waters TMDL for toxicity. General Permit Fact Sheet § II.F.6.h.iv.4; see also General Permit, Attachment E at 21–23.

127. The interim requirements must be met at a permittee's industrial discharge location(s), and apply at this time. General Permit, Attachment E at 21–23.

128. To implement the interim requirements of the Dominguez/Harbor Waters TMDL, the General Permit "associates receiving water bed toxicity targets to discharges of [] metals bound to sediment particulates." General Permit, Fact Sheet, § II.F.6.h.iv.

129. Storm water discharges to the Dominguez/Harbor Waters TMDL containing Total Suspended Solids concentrations exceeding the 100 mg/L Numeric Action Level ("NAL") violate the General Permit's TMDL requirements. General

Permit, § VII.A.

**D.      Storm Water Pollution Prevention Plan Requirements**

130.    The General Permit requires permittee facilities to develop and implement a Storm Water Pollution Prevention Plan ("Pollution Prevention Plan") prior to conducting, and in order to lawfully continue, industrial activities. General Permit, §§ I.I.54, X.B.

131.    To comply with the General Permit, dischargers must have developed and implemented a SWPPP by July 15, 2015, or upon commencement of industrial activity. *See* General Permit, § X.B.

132.    "Failure to develop or implement an adequate [Pollution Prevention Plan], or update or revise an existing [Pollution Prevention Plan] as required, is a violation of this General Permit." General Permit, Fact Sheet § II.I.1.

133.    The objectives of Pollution Prevention Plans are: (1) to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and non-storm water discharges; and (2) to describe and detail site-specific Best Management Practices to reduce or prevent pollutant concentrations in storm water discharges to levels that comply with the General Permit's technology-based and water quality-based effluent limitations. General Permit, § X.C.

134.    Each Pollution Prevention Plan must include the following elements, among others:

(1) a narrative description and assessment of all industrial activities, potential sources of pollution, and pollutants associated with each potential source;

(2) identification and location where materials are being shipped,

received, stored, and handled, as well as the typical quantities of such materials and the frequency with which they are handled;

(3) a description of dust and particulate generating activities;

(4) a site map including all areas of industrial activity subject to the General Permit that depicts the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, pollutant control measures, and municipal storm drain inlets that may receive the facility's discharge;

(5) a detailed description of the Best Management Practices developed and implemented, as well as a justification for Best Management Practices that are not being implemented;

(6) identification of areas of the Facility where the minimum Best Management Practices do not adequately reduce or prevent pollutants in storm water discharges and advanced Best Management Practices to be implemented in those areas;

(7) identification of unauthorized non-stormwater discharges; and

(8) identification of persons and their current responsibilities for developing and implementing the Pollution Prevention Plan.

135. Each of the industrial processes and all industrial activities undertaken at the Facility are pollutant sources that must be described and assessed in each Pollution Prevention Plan for their potential contribution of pollutants in storm water discharges. General Permit, §§ X.C, X.F, X.G.

136. Pollution Prevention Plans must be evaluated and revised as necessary,

and on at least an annual basis, to ensure ongoing compliance. General Permit, § X.B. Evaluation of the Pollution Prevention Plans requires a review of all visual observation records, inspection reports, sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented, and maintained, or whether additional BMPs are needed. General Permit, §§ X.A, XV.

137.    Royal White's failure to develop, implement, or revise a comprehensive Pollution Prevention Plan for its Facility that contains all required elements is a violation of the General Permit, and establishes liability under the Act. General Permit, § X.B; *see also* General Permit, Factsheet § II.I.1.

**E.    The General Permit's Monitoring and Reporting Requirements**

138.    All NPDES permits shall contain water quality monitoring requirements sufficient to assure compliance with permit technology-based and water quality-based effluent limitations. *See* 33 U.S.C. § 1342(a)(2); 40 C.F.R. § 122.44(i)(1) ("[E]ach NPDES permit shall include . . . monitoring requirements . . . to assure compliance with permit limitations.").

139.    The CWA requires the collection and analysis of storm water discharge samples sufficient to determine compliance with all permit limits. General Permit, § XI.B; *NRDC v. County of L.A.*, 725 F.3d 1194, 1208 (9th Cir. 2013) ("[T]he Clean Water Act *requires* every NPDES permittee to monitor its discharges into the navigable waters of the United States in a manner sufficient to determine whether it is in compliance with the relevant NPDES permit." (emphasis in original)).

140. The General Permit requires permittees to collect storm water samples from each location where storm water is discharged from its facility. General Permit, §§ XI.B.4–5.

141. The General Permit requires permittees to collect and analyze storm water samples from two Qualifying Storm Events ("QSEs") between July 1 and December 31 of each reporting year and two (2) Qualifying Storm Events between January 1 and June 30 of each reporting year. General Permit, § XI.B.2.

142. A Qualifying Storm Event is a precipitation event that: (a) produces a discharge from at least one drainage area at the permittee facility; and (b) is preceded by forty-eight (48) hours with no discharge from any drainage area. General Permit, § XI.B.1.

143. Each sample must be collected within four (4) hours of the start of a discharge, or the start of facility operations if the Qualifying Storm Event occurs within the 12-hour period prior to business hours. General Permit, § XI.B.5.

144. The General Permit requires permittees to analyze samples for, among other parameters:

(1) conventional pollutants (pH, total suspended solids, and either total organic carbon or oil and grease) (§ XI.B.6.a–b);

(2) facility-specific pollutants identified in the pollutant source description and evaluation process including (§ XI.B.6.c);

(3) Standard Industrial Classification code-based parameters listed in the General Permit at Table 1 (§ XI.B.6.d);

(4) parameters related to receiving waters with 303(d) listed impairments

or approved Total Maximum Daily Loads including, without limitation, copper, zinc, cadmium, chromium, mercury, lead, PCBs, and 4, 4' DDT for the Consolidated Slip (§ XI.B.6.e); and

(5) Regional Board-mandated parameters, which are any additional pollutants identified by the relevant Regional Board (§ XI.B.6.f).

145. The General Permit requires permittees to submit all sampling and analytical results for every sample via the State Board's online reporting system within thirty (30) days of obtaining each analytical report from a certified laboratory. General Permit, § XI.B.11.a.

146. Permittees that fail to conduct and report required storm water sampling are in violation of the General Permit.

147. Permittees must also conduct visual observations at least once a month, and at the same time sampling occurs at each discharge location. General Permit, § XI.A.

148. Records of visual observations must document the presence of any floating and suspended material, oil and grease, discolorations, turbidity, or odor, and identify the source of any pollutants. General Permit, § XI.A.2.

149. Dischargers must document and maintain records of observations, observation dates, locations observed, and responses taken to reduce or prevent pollutants observed in storm water discharges. General Permit, § XI.A.3.

150. Permittees that fail to conduct and maintain records of required visual observations are in violation of the General Permit.

(a) <u>Monitoring Implementation Plan Requirements</u>

151.    Permittees must develop a written plan containing the permittee facility's monitoring and reporting program ("Monitoring Implementation Plan") to be included in the Pollution Prevention Plan prior to conducting, and in order to lawfully continue, industrial activities. General Permit, §§ X.I, XI.

152.    The objective of the Monitoring Implementation Plan is to detect and measure concentrations of pollutants in a facility's storm water discharges to assess compliance with the General Permit's substantive requirements, including the technology-based and water quality-based effluent limitations. General Permit, Factsheet § II.J.1.

153.    Information derived from the Monitoring Implementation Plan informs each permittee as to whether it must adapt Best Management Practice design and/or implementation to ensure that storm water and non-storm water discharges comply with the General Permit. General Permit, §§ X.I, XI.

154.    The Monitoring Implementation Plan is an essential component in the General Permit's mandatory iterative self-evaluation process whereby permittees must implement Best Management Practices contained in the Pollution Prevention Plan, evaluate Best Management Practice effectiveness using visual observation and storm water sampling data, and then revise Best Management Practices as necessary to consistently comply with the General Permit's technology-based and water quality-based effluent limitations. *See* 33 U.S.C. § 1342(a)(2).

155.    Permittees that fail to develop and implement an adequate Monitoring Implementation Plan that includes both visual observations and sampling and analysis are in violation of the General Permit. General Permit, § II.J.3.

## F. Numeric Action Levels and Exceedance Response Actions

156. The General Permit requires permittees to take corrective action in response to monitoring data that demonstrates that pollutant concentrations in storm water discharged from its facility exceed Numeric Action Levels ("NALs"). General Permit, § XII.

157. Annual NALs are similar to, and derive from, U.S. EPA Benchmarks. General Permit, Fact Sheet, § I.D. Some of the annual Numeric Action Levels applicable to the Facility are summarized in Table 4.

**TABLE 4**
NALs APPLICABLE TO THE FACILITY'S DISCHARGES

| POLLUTANT | NAL |
|---|---|
| TSS | 100 mg/L |
| copper | 0.0332 mg/L |
| aluminum | 0.75 mg/L |
| zinc | 0.26 mg/L |
| N+N | 0.68 mg/L |
| COD | 120 mg/L |
| pH | 6.0–9.0 s.u. |
| magnesium | 0.064 s.u. |
| lead | 0.262 mg/L |
| cadmium | 0.0053 mg/L |
| arsenic | 0.15 mg/L |
| BOD | 30 mg/L |

158. An NAL exceedance occurs when the average of all sampling data for a given pollutant from a reporting year exceeds the NAL assigned to that pollutant, i.e. if the average concentration from three samples of zinc is 0.52 mg/L (e.g., 0.26 mg/L, 0.52 mg/L, and 0.78 mg/L). General Permit, § XII.A.1.

159. NAL exceedances operate as a signal to owners/operators, state agencies, and the public that a permittee's Best Management Practices are patently deficient,

and therefore immediate remedial actions are required. General Permit, § XII.A.

160. However, the NAL "are not intended to serve as technology-based or water quality-based numeric effluent limitations. The [Numeric Action Levels] are not derived directly from either BAT/BCT requirements or receiving water objectives. [Numeric Action Levels] exceedances defined in this General Permit are not, in and of themselves, violations of this General Permit." General Permit, § I.N.77.

161. The General Permit requires a permittee with NAL exceedance(s) to develop and implement Exceedance Response Action ("ERA") procedures. General Permit, § XII.

162. A discharger's failure to comply with the mandatory corrective action process triggered by NAL exceedance(s) is a violation of the General Permit and the Act. General Permit, § I.N.76, Fact Sheet § K.2.b ("[I]t is a violation of the permit [] to fail to comply with the Level 1 status and Level 2 status ERA requirements in the event of [] exceedances.")

163. Compliance with the ERA requirements is an independent mandate and does not shield a permittee from liability for violations of the General Permit's technology-based or water quality-based mandates, nor excuse past or ongoing violations of the General Permit's pollution prevention mandates.

## G. Water Quality Based Corrective Actions

164. Permittees are further required to complete Water Quality Based Corrective Actions when monitoring data demonstrates that pollutant concentrations in storm water violate Receiving Water Limitations. General Permit, § XX.B.

165. Water Quality Based Corrective Actions include without limitation:

(1) an evaluation of pollutant sources and Best Management Practices implementation;

(2) assessment of whether additional measures are necessary to reduce or prevent pollutant discharge; and

(3) certification that all additional measures necessary to meet Receiving Water Limitations have been identified and included in the facility's Pollution Prevention Plan. *See* General Permit, § XX.B.1.a–c.

166. Failure to comply with Water Quality Based Corrective Action requirements is an independent violation of this General Permit. General Permit, Fact Sheet II.E.1.

167. Compliance with the General Permit's Water Quality Based Corrective Actions is an independent mandate, and does not shield a permittee from liability for violations of the General Permit's technology-based or water quality-based mandates, nor excuse past or ongoing violations of the General Permit's pollution prevention mandates.

### H. The General Plan's Annual Comprehensive Facility Compliance Evaluation Requirement

168. Permittees must complete an Annual Comprehensive Facility Compliance Evaluation ("Annual Compliance Evaluation") each reporting year. General Permit, § XV. The goal of the Annual Compliance Evaluation is to ensure and certify compliance with each of the General Permit's other mandates.

169. The Annual Compliance Evaluation must include, at a minimum:

(1) a review of all sampling, visual observation, and inspection records

conducted during the previous year;

(2) an inspection of all areas of industrial activity and associated pollutant sources for evidence of pollutants entering the storm water conveyance system;

(3) an inspection of all drainage areas previously identified as having no exposure to industrial activities;

(4) an inspection of equipment needed to implement Best Management Practices;

(5) an inspection and evaluation of all Best Management Practices for proper design, implementation, and adequate reduction/prevention of pollutants in storm water discharges;

(6) a determination of whether additional Best Management Practices are needed to comply with the General Permit; and

(7) an assessment of any other factors needed to comply with the requirements of Section XVI.B (Annual Report mandates). General Permit, § XVI.

170.    The General Permit requires permittees to submit a Compliance Checklist with each Annual Report that contains the following:

(1) an indication of whether the permittee complies with, and has addressed all applicable requirements of, the General Permit;

(2) an explanation for any noncompliance with requirements within the Reporting Year, as indicated in the Compliance Checklist;

(3) an identification, including page numbers and/or sections, of all revisions made to the Pollution Prevention Plan within the Reporting Year; and

1    (4) the date(s) of the annual Compliance Evaluation.

2    171.   Any person who knowingly makes any false material statement,

3    representation, or certification in any record or other document submitted or required

4    to be maintained under this General Permit, including reports of compliance or

5    noncompliance shall, upon conviction, be punished by a fine of not more than

6    $10,000.00 or by imprisonment for not more than two years or by both. General

7    Permit, § XXI.N.

8    **V.     STATEMENT OF FACTS**

9        **A. The Facility**

10   172.   Royal White is a "person" pursuant to the Act. *See* 33 U.S.C. § 1362(5).

11   173.   Royal White is the legally responsible operator of the 40,000 square foot

12   Facility located at 645 North Pioneer Avenue, Wilmington, California 90744.

13   174.   Industrial activities conducted at the Facility include, but are not limited

14   to, transportation, handling, processing, and storage of raw materials, intermediate and

15   final products, and waste materials used in or derived from the manufacture of cement.

16   175.   The Facility has an annual output capacity of 50,000 tons of cementitious

17   materials.

18   176.   These activities are conducted in both covered and uncovered areas at the

19   Facility.

20   177.   Each industrial process undertaken by Royal White at the Facility,

21   including without limitation those industrial activities described in paragraphs 173 to

22   176, has the potential to generate pollutants that will contaminate its storm water

23   discharges.

178.   Polluted storm water discharges from SIC code 3241, such as those conducted at the Facility, can also contain biological oxygen demand, potassium, sulfate, oil and grease, lead, arsenic, cadmium, chromium, benzene, gas/diesel fuel, and fuel additives. *See* U.S. EPA, *Industrial Stormwater Fact Sheet Series, Sector E: Glass, Clay, Cement, Concrete, and Gypsum Product Manufacturing Facilities* 2–3 (Feb. 2021), https://www.epa.gov/sites/default/files/2015-10/documents/sector_e_glass.pdf.

179.   The Facility also has the potential to discharge pollutants present in fly ash.

180.   During storm events, these accumulations of dust and particulate are discharged as dissolved and suspended pollutants in storm water to North Pioneer Avenue, flow into a municipal storm drain, from which they are conveyed to the Consolidated Slip, Greater Los Angeles/Long Beach Harbor Waters, San Pedro Bay, and the Pacific Ocean.

181.   Therefore, the Facility is a "point source" of pollution as defined in section 502(14) of the Clean Water Act, 33 U.S.C. section 1642(14), and section 122.2 of Title 40 of the Code of Federal Regulations.

182.   The Consolidated Slip, Greater Los Angeles/Long Beach Harbor Waters, San Pedro Bay, and Pacific Ocean are all waters of the United States.

183.   Based on LA Waterkeeper's investigation—including extensive internet research, field visits, storm water discharge observation, sampling, and analysis, and an evaluation of satellite imagery—storm water containing pollutants is discharged from the Facility to the Receiving Waters without coverage under the General Permit or an individual NPDES permit.

184.    In a SMARTS filing dated August 29, 2023, the Facility is listed as a "Nonfiler," with the status "NOI required."

185.    In an August 29, 2023 email to Johnny Lutfallah, Operations Manager for the Facility, Edlin Gonzalez, Water Resource Control Engineer for the LA Regional Board, instructs Royal White to "Please have the application open by September 26, 2023."

186.    As of the date of this Complaint, Royal White has not filed an NOI to enroll in the General Permit.

187.    As of the date of this Complaint, Royal White does not have NPDES permit coverage for its discharges.

188.    Every day that the Facility discharges storm water without permit coverage is a separate and distinct violation of the Act.

189.    Accordingly, Royal White is liable for violations of the Act and General Permit's Discharge Prohibitions for unpermitted discharges on each day of significant rainfall[1] since at least August 21, 2018.

190.    These violations are ongoing, and LA Waterkeeper will include additional violations as information becomes available.

191.    Even if Royal White obtains General Permit coverage during the pendency of LA Waterkeeper's enforcement action, industrial operations at the Facility will continue to be in violation of the General Permit's effluent limitations and other conditions as described below.

_____

[1] Defined by U.S. EPA as an event generating 0.1 inches or more of rainfall, which generally results in discharges at a typical industrial facility.

**B. LA Waterkeeper's Storm Water Sample Collection and Analysis**

192.    On February 24, 2023, LA Waterkeeper sampled storm water sheet flow discharged from: 1) the entrance of the Facility's northernmost driveway on North Pioneer Avenue ("Sample Location 1"); and 2) approximately 10 feet north and downstream of Sample Location 1, intermingled flow from the northernmost driveway and discharge from the Facility via an overflow pipe located at the Facility fence ("Sample Location 2").

193.    The combined sheet flow discharge from the Facility's driveway and overflow pipe was observed to flow into a storm drain drop inlet.

194.    LA Waterkeeper's analysis of those samples documents storm water discharges from the Facility containing the following pollutants: aluminum, copper, zinc, total suspended solids ("TSS"), nitrate plus nitrite nitrogen, chemical oxygen demand, iron, magnesium, and pH.

195.    The storm water sample collected by LA Waterkeeper at Sample Location 1 on February 24, 2023 contained copper concentrations of 0.017 mg/L, which exceeds the 0.0048 mg/L U.S. EPA Benchmark and 0.0048 mg/L CTR for copper.

196.    The storm water sample collected by LA Waterkeeper at Sample Location 2 on February 24, 2023 contained copper concentrations of 0.029 mg/L, which exceeds the 0.0048 mg/L U.S. EPA Benchmark and 0.0048 mg/L CTR for copper.

197.    The storm water sample collected by LA Waterkeeper at Sample Location 1 on February 24, 2023 contained zinc concentrations of 0.16 mg/L, which

exceeds the 0.09 mg/L U.S. EPA Benchmark and 0.09 mg/L CTR for zinc.

198. The storm water sample collected by LA Waterkeeper at Sample Location 2 on February 24, 2023 contained zinc concentrations of 0.23 mg/L, which exceeds the 0.09 mg/L U.S. EPA Benchmark and 0.09 mg/L CTR for copper.

199. The storm water sample collected by LA Waterkeeper at Sample Location 1 on February 24, 2023 contained aluminum concentrations of 2.8 mg/L, which exceeds the 1.1 mg/L U.S. EPA Benchmark and 0.75 mg/L NAL for aluminum.

200. The storm water sample collected by LA Waterkeeper at Sample Location 2 on February 24, 2023 contained aluminum concentrations of 6.2 mg/L, which exceeds the 1.1 mg/L U.S. EPA Benchmark and 0.75 mg/L NAL for aluminum.

201. The storm water sample collected by LA Waterkeeper at Sample Location 1 on February 24, 2023 contained N+N concentrations of 0.69 mg/L, which exceeds the 0.68 mg/L U.S. EPA Benchmark and 0.68 mg/L NAL for N+N.

202. The storm water sample collected by LA Waterkeeper at Sample Location 2 on February 24, 2023 contained N+N concentrations of 0.81 mg/L, which exceeds the 0.68 mg/L U.S. EPA Benchmark and 0.68 mg/L NAL for N+N.

203. The storm water sample collected by LA Waterkeeper at Sample Location 2 on February 24, 2023 contained COD concentrations of 190 mg/L, which exceeds the 120 mg/L U.S. EPA Benchmark and 120 mg/L NAL for COD.

204. The storm water sample collected by LA Waterkeeper at Sample Location 1 on February 24, 2023 contained TSS concentrations of 160 mg/L, which

exceeds the 50 mg/L ELG, 100 mg/L U.S. EPA Benchmark, 100 mg/L NAL for TSS, and 100 mg/L Dominguez/Harbor Waters TMDL.

205. The storm water sample collected by LA Waterkeeper at Sample Location 2 on February 24, 2023 contained TSS concentrations of 450 mg/L, which exceeds the 50 mg/L ELG, 100 mg/L U.S. EPA Benchmark, and 100 mg/L NAL for TSS, and 100 mg/L Dominguez/Harbor Waters TMDL.

206. The storm water sample collected by LA Waterkeeper at Sample Location 1 on February 24, 2023 contained pH concentrations of 9.82 s.u., which exceeds the 6.0–9.0 s.u. ELG, 6.0–9.0 s.u. U.S. EPA Benchmark, and 6.0–9.0 s.u. NAL for pH.

207. The storm water sample collected by LA Waterkeeper at Sample Location 2 on February 24, 2023 contained p concentrations of 11.2 s.u., which exceeds the 6.0–9.0 s.u. ELG, 6.0–9.0 s.u. U.S. EPA Benchmark, and 6.0–9.0 s.u. NAL for pH.

208. The storm water sample collected by LA Waterkeeper at Sample Location 1 on February 24, 2023 contained iron concentrations of 2.6 mg/L, which exceeds the 1.0 mg/L NAL for iron.

209. The storm water sample collected by LA Waterkeeper at Sample Location 2 on February 24, 2023 contained iron concentrations of 1.5 mg/L, which exceeds the 1.0 mg/L NAL for iron.

210. The storm water sample collected by LA Waterkeeper at Sample Location 1 on February 24, 2023 contained magnesium concentrations of 1.86 mg/L, which exceeds the 0.064 mg/L NAL for magnesium.

211. The storm water sample collected by LA Waterkeeper at Sample Location 2 on February 24, 2023 contained magnesium concentrations of 1.69 mg/L, which exceeds the 0.064 mg/L NAL for magnesium.

212. A true and accurate summary of the data that is the basis for allegations contained in paragraphs 194 to 211 is contained in EXHIBIT 2 (comparing sampling data results to ELG, U.S. EPA Benchmark, NAL, and CTR pollution standards) attached to, and incorporated by reference into, this Complaint.

**C. The General Permit and the Facility**

213. The Facility has no NPDES Permit coverage for its discharges.

214. The NPDES Permit applicable to the Facility is the General Permit.

215. Even if the Facility obtains General Permit coverage, it will be in violation of the effluent limitations and requirements of the General Permit, as described below.

**1. Discharge Prohibitions**

216. LA Waterkeeper's sampling data, document review, and visual observations establish that Royal White has violated and continues to violate the General Permit Discharge Prohibitions. *See* e.g., General Permit, §§ III.B, D.

217. These violations are ongoing, and LA Waterkeeper will include additional violations when information becomes available.

**2. BAT/BCT and Best Management Practices**

218. On information and belief, Royal White has failed to implement minimum and advanced Best Management Practices employed by similar industrial facilities representing BAT/BCT.

219. An August 18, 2023 Inspection Report by the Regional Board notes

"White cement observed throughout the facility's ground."

220. The August 18, 2023 Inspection Report also notes "Bulk bags observed to be stored outdoors with no permanent rain cover."

221. The August 18, 2023 Inspection Report further notes "Two Silo's [sic] observed outside, one open top roll-off bin with white material."

222. An August 24, 2023 Inspection Report by the Regional Board notes that staff observed "milky white" water "puddled" near a PVC pipe outside the facility, as well as "white cement caked onto the street . . . [and] the bottom of the curb leading to the storm drain."

223. The August 24, 2023 Inspection Report also noted "Industrial stormwater accumulated within the facility yard, water discharged into street."

224. The August 24, 2023 Inspection Report further noted "Industrial stormwater in the facility's scale discharged through PVC pipe at the front of the facility."

225. Exceedances of U.S. EPA's Benchmarks and the ELGs, as well as the General Permit's NALs, indicate that Royal White has not implemented sufficient BMPs to comply with the technology-based Effluent Limitations required under the Act and General Permit.

226. LA Waterkeeper's investigation—including observations during both wet and dry weather of accumulations of cementitious material throughout the Facility's outdoor areas, on roofs, on public streets, and in neighboring properties and residences—confirm that Royal White has failed to implement even minimum required BMPs, e.g., good housekeeping, and is in ongoing violation of BAT/BCT requirements.

227. Further, LA Waterkeeper has observed loading, unloading, and other industrial operations in both wet and dry weather on public streets where Royal White has not developed and implemented any BMPs whatsoever.

228. Each day Royal White operates the Facility without BMPs achieving BAT/BCT-level pollutant reductions is a separate and distinct violation of the General Permit's technology-based mandates and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

229. Royal White is liable for violations of related remedial mandates on an ongoing basis.

230. These violations are ongoing, and LA Waterkeeper will include additional violations when information becomes available.

### 3. Receiving Water Limitations

231. Royal White has violated and continues to violate the General Permit's Receiving Water Limitations. General Permit § VI.A–C.

232. Data available evidences the discharge of storm water containing high concentrations of zinc and copper, toxic pollutants for which the Receiving Waters are impaired.

233. These elevated zinc and copper concentrations further evidence that Royal White's discharges of storm water with TSS in excess of 100 mg/L are violations of the interim requirements for the Dominguez/Harbor Waters TMDL.

234. LA Waterkeeper's storm water sampling data and in person observations establish that the Facility is causing and/or contributing to violations of applicable WQSs in violation of the General Permit's Receiving Water Limitation. General

Permit § VI.A–C.

235.  Despite exceeding applicable WQSs, Royal White has not, to LA Waterkeeper's knowledge based on publicly available records, completed any Water Quality Based Corrective Actions as required. See General Permit, § XX.B.

236.  Royal White is liable for causing and contributing to an exceedance of applicable WQSs under the Act and General Permit's Receiving Water Limitations for each day of significant rainfall from August 21, 2018 to the present. *See* EXHIBIT 1-Appendix 1 (List of significant rainfall events from January 2018–May 2023).

237.  Many of the pollutants discharged from the Facility are on the list of chemicals published by the State of California that are known to cause cancer, birth defects, and/or developmental or reproductive harm, and therefore violate the first Receiving Water Limitation. *See* Cal. Health & Safety Code §§ 25249.5–25249.14.

238.  Royal White is liable for violations of related remedial mandates on an ongoing basis.

239.  These violations are ongoing, and LA Waterkeeper will include additional violations when information becomes available.

### 4. Stormwater Pollution Prevention Plan

240.  Royal White has failed, and continues to fail, to develop, implement, and/or revise a legally adequate Pollution Prevention Plan prior to conducting industrial activities.

241.  Every day the Facility operates with an inadequately developed, implemented, and/or properly revised Pollution Prevention Plans is a separate and distinct violation of the General Permit and Act.

242. Therefore, Royal White has been in daily and continuous violation of the General Permit's Pollution Prevention Plan requirements for every day of operations, and subject to civil penalties for all such violations, since at least August 21, 2018.

243. These violations are ongoing, and LA Waterkeeper will include additional violations as information becomes available.

### 5. Monitoring Implementation Plans

244. Based on LA Waterkeeper's examination, Royal White has failed to develop or implement a MIP prior to conducting industrial activities, in violation of the General Permit.

245. The General Permit's annual compliance period runs from July 1 of each calendar year to June 30 of the subsequent calendar year, e.g. July 1, 2022 through June 30, 2023.

246. Royal White personnel did not conduct visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2018–2019 permit term as required by the General Permit. *See* General Permit, § XI.B.4.

247. Royal White personnel did not conduct visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2019–2020 permit term as required by the General Permit. *See* General Permit, § XI.B.4.

248. Royal White personnel did not conduct visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2020–2021 permit term as required by the General Permit. *See*

1  General Permit, § XI.B.4.

2  249.  Royal White personnel did not conduct visual observations of all areas of
3  industrial activity and areas impacted by the Facility's industrial storm water
4  discharges during the 2021–2022 permit term as required by the General Permit. *See*
5  General Permit, § XI.B.4.

6  250.  Royal White personnel did not conduct visual observations of all areas of
7  industrial activity and areas impacted by the Facility's industrial storm water
8  discharges during the 2022–2023 permit term as required by the General Permit. *See*
9  General Permit, § XI.B.4.

10  251.  Royal White personnel did not conduct visual observations of all areas of
11  industrial activity and areas impacted by the Facility's industrial storm water
12  discharges during the 2023–2024 permit term as required by the General Permit. *See*
13  General Permit, § XI.B.4.

14  252.  Failures to conduct visual observations of all areas of industrial activity
15  and areas impacted by the Facility's industrial storm water discharges evidence
16  inadequate Monitoring Implementation Plan development and implementation.

17  253.  Royal White personnel did not record visual observations of all areas of
18  industrial activity and areas impacted by the Facility's industrial storm water
19  discharges during the 2018–2019 permit term as required by the General Permit. *See*
20  General Permit, § XI.B.4.

21  254.  Royal White personnel did not record visual observations of all areas of
22  industrial activity and areas impacted by the Facility's industrial storm water
23  discharges during the 2019–2020 permit term as required by the General Permit. *See*

General Permit, § XI.B.4.

255.   Royal White personnel did not record visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2020–2021 permit term as required by the General Permit. *See* General Permit, § XI.B.4.

256.   Royal White personnel did not record visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2021–2022 permit term as required by the General Permit. *See* General Permit, § XI.B.4.

257.   Royal White personnel did not record visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2022–2023 permit term as required by the General Permit. *See* General Permit, § XI.B.4.

258.   Royal White personnel has not recorded visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2023–2024 permit term as required by the General Permit. *See* General Permit, § XI.B.4.

259.   Royal White's failure to record visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges further evidences inadequate Monitoring Implementation Plan development and implementation.

260.   Royal White's failure to analyze storm water samples further evidences inadequate Monitoring Implementation Plan development and implementation.

261. Every day the Facility operates with an inadequately developed and implemented Monitoring Plan is a separate and distinct violation of the General Permit and Act.

262. Royal White has been in daily and continuous violation of the General Permit's Monitoring Plan requirements, and subject to civil penalties for all such violations, since at least August 21, 2018.

263. These violations are ongoing, and LA Waterkeeper will include additional violations when information becomes available.

### 6. Annual Compliance Evaluation

264. Royal White personnel did not conduct any Annual Compliance Evaluation during the 2018–2019 permit term as required by the General Permit. *See* General Permit, § XV.

265. Royal White personnel did not conduct any Annual Compliance Evaluation during the 2019–2020 permit term, nor document any justification for not doing so, as required by the General Permit. *See* General Permit, § XV.

266. Royal White personnel did not conduct any Annual Compliance Evaluation during the 2020–2021 permit term, nor document any justification for not doing so, as required by the General Permit. *See* General Permit, § XV.

267. Royal White personnel did not conduct any Annual Compliance Evaluation during the 2021–2022 permit term, nor document any justification for not doing so, as required by the General Permit. *See* General Permit, § XV.

268. Royal White personnel did not conduct any Annual Compliance Evaluation during the 2022–2023 permit term, nor document any justification for not

doing so, as required by the General Permit. *See* General Permit, § XV.

269.    Royal White personnel has not conducted any Annual Compliance Evaluation during the 2023–2024 permit term, nor document any justification for not doing so, as required by the General Permit. *See* General Permit, § XV.

270.    Royal White has been in annual violation of the General Permit's Annual Compliance Evaluation requirements, and subject to civil penalties for all such violations, since at least August 21, 2018.

271.    These violations are ongoing, and LA Waterkeeper will include additional violations when information becomes available.

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Failure to Comply with Duty to Apply for an NPDES Permit in Violation of the Clean Water Act (33 U.S.C. §§ 1311, 1342)**

272.    LA Waterkeeper re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

273.    Royal White is a "person" within the definition of section 502(5) of the Act and 40 C.F.R. § 122.2.

274.    The Facility is a "point source" of pollution as defined in section 502(14) of the Act and 40 C.F.R. § 122.2.

275.    Stormwater discharged by Royal White meets the definition of a "pollutant" contained in section 502(6) of the Act and 40 C.F.R. § 122.2.

276.    Royal White's discharges of storm water are "discharges of a pollutant" as defined in Section 502(12) of the Act and 40 C.F.R. § 122.2.

277.    Any person who discharges pollutants and does not have an effective

permit to discharge pollutants to waters of the United States must submit an application for an NPDES permit. 40 C.F.R. § 122.21(a).

278. LA Waterkeeper is informed and believes, and thereon alleges, that Royal White has not applied for an NPDES permit authorizing the discharge of polluted storm water to waters of the United States.

279. Each day that Royal White has operated and continues to operates without submitting an application for of an NPDES Permit for the discharge of pollutants to waters of the United States is a separate and distinct violation of Section 301(a) of the Act.

280. Royal White has been in violation of the Act for operating without applying for an NPDES permit every day since at least August 21, 2018.

281. Royal White's daily violations of the Act are ongoing.

282. An action for injunctive relief under the Clean Water Act is authorized by Section 505(a) of the CWA.

283. Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper members and the citizens of the State of California, for which they have no plain, speedy, or adequate remedy at law.

284. WHEREFORE, LA Waterkeeper prays judgment against Royal White as set forth hereafter.

## SECOND CAUSE OF ACTION
**Unpermitted Discharges of Pollutants to Waters of United States in Violation of the Clean Water Act (33 U.S.C. §§ 1311, 1342)**

285. LA Waterkeeper re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

286. All unpermitted discharges of polluted storm water "associated with industrial activity" are violations of the Act. 33 U.S.C. § 1342(b)(2)(B).

287. Storm water containing pollutants is discharged from the Facility on every day of significant rainfall.

288. Every day that the Facility discharges storm water without permit coverage is a separate and distinct violation of the Act.

289. Royal White has been in further violation of the Act for discharging storm water without a permit on every day of significant rainfall since August 21, 2018. 33 U.S.C. §§ 1311(a).

290. Royal White's date-specific violations of the Act are ongoing.

291. An action for injunctive relief under the Clean Water Act is authorized by Section 505(a) of the CWA.

292. Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper and the citizens of the State of California, for which they have no plain, speedy, or adequate remedy at law.

293. WHEREFORE, LA Waterkeeper prays judgment against Royal White as set forth hereafter.

## THIRD CAUSE OF ACTION
**Discharge of Contaminated Storm Water in Violation of the General Permit's Technology-Based Effluent Limitations and the Act**
**(General Permit Conditions and 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

294. LA Waterkeeper re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

295. Based on LA Waterkeeper's examination Royal White has failed, and

continues to fail, to reduce or prevent pollutants associated with industrial activities from being discharged to waters of the United States through the implementation of Best Management Practices at the Facility that achieve the technology-based BAT/BCT treatment standards.

296.    LA Waterkeeper's February 24, 2023 sampling and analysis of storm water discharging from Royal White's overflow pipe demonstrate that the Facility discharges storm water from the Facility containing concentrations of pollutants that exceed the BAT/BCT level of control.

297.    Royal White's failures to develop and/or implement Best Management Practices that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility are violations of the General Permit's technology-based effluent limitations and the Act. *See* General Permit, §§ I.D.32, V.A; 33 U.S.C. § 1311(b).

298.    Royal While violates and will continue to violate the General Permit's technology-based pollution control standard each and every time polluted storm water containing concentrations of pollutants exceeding the BAT/BCT level of control are discharged from the Facility.

299.    Each and every violation of the General Permit's technology-based effluent limitations is a separate and distinct violation of section 301(a) of the Act. 33 U.S.C. § 1311(a).

300.    Royal White's violations of the General Permit's technology-based effluent limitations and the Act are ongoing and continuous.

301.    Royal White is subject to an assessment of civil penalties for each and every violation of the General Permit and Act occurring from August 21, 2018 to the

present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

302.    An action for injunctive relief is authorized by section 505(a) of the Act. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

303.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, LA Waterkeeper prays for judgment against Royal White set forth hereafter.

### FOURTH CAUSE OF ACTION
**Discharges of Contaminated Storm Water in Violation of the General Permit's Water Quality-Based Effluent Limitations and the Act**
**(General Permit Conditions and 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

304.    LA Waterkeeper re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

305.    LA Waterkeeper's February 24, 2023 sampling and analysis of storm water discharging from Royal White's overflow pipe demonstrate that the Facility has discharged contaminated storm water from the Facility containing levels of pollutants that cause or contribute to exceedances of applicable water quality standards in violation of the General Permit's water quality-based effluent limitations. *See* General Permit, § VI.A.

306.    LA Waterkeeper's February 24, 2023 sampling and analysis of storm

water discharging from Royal White's overflow pipe demonstrate that the Facility has discharged contaminated storm water from the Facility containing levels of pollutants that adversely impact human health and the environment in violation of the General Permit's water quality-based effluent limitations. *See* General Permit, § VI.B.

307. LA Waterkeeper's February 24, 2023 sampling and analysis of storm water discharging from Royal White's overflow pipe demonstrate that the Facility has discharged contaminated storm water from the Facility containing levels of pollutants that threaten to cause pollution or a public nuisance in violation of the General Permit's water quality-based effluent limitations. *See* General Permit, § VI.C.

308. Violations of the General Permit's water quality-based effluent limitations are ongoing and continuous.

309. Each and every violation of any of the General Permit's water quality-based effluent limitations is a separate and distinct violation of section 301(a) of the Act. 33 U.S.C. § 1311(a).

310. Every day, since at least August 21, 2018, that Royal White has discharged polluted storm water from the Facility in violation of the General Permit's water quality-based effluent limitations is a separate and distinct violation of section 301(a) of the Act. *See* 33 U.S.C. § 1311(a).

311. Royal White is subject to an assessment of civil penalties for each and every violation of the General Permit and Act occurring from August 21, 2018 to the present, pursuant to sections 309(d) and 505 of the Act. *See* 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

312. An action for injunctive relief is authorized by section 505(a) of the Act.

33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

313.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, LA Waterkeeper prays for judgment against Royal White as set forth hereafter.

## FIFTH CAUSE OF ACTION
### Failure to Prepare, Implement, Review, and Update An Adequate Storm Water Pollution Prevention Plan
### (General Permit Conditions and 33 U.S.C. §§ 1311, 1342)

314.   LA Waterkeeper re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

315.   Royal White has not developed and implemented a legally adequate Pollution Prevention Plan for the Facility, including failing to comply with those requirements detailed in paragraph 134 of this Complaint.

316.   Royal White's violations of the General Permit's Pollution Prevention Plan requirements are ongoing and continuous.

317.   Each day since August 21, 2018, that Royal White has not developed, implemented, and reviewed and updated a legally adequate Pollution Prevention Plan for the Facility is a separate and distinct violation of the General Permit and the Act. 33 U.S.C. § 1311(a).

318.   Royal White has been in violation of the General Permit's Pollution

Prevention Plan requirements every day since August 21, 2018. Violations continue each day that an adequate Pollution Prevention Plan for the Facility is not developed and fully implemented.

319. Royal White is subject to an assessment of civil penalties for each and every violation of the Act occurring from August 21, 2018, to the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

320. An action for injunctive relief is authorized by section 505(a) of the Act. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

321. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, LA Waterkeeper prays for judgment against Royal White as set forth hereafter.

### SIXTH CAUSE OF ACTION
**Failure to Develop and Implement An Adequate**
**Monitoring Implementation Plan**
**(General Permit Conditions and 33 U.S.C. §§ 1311, 1342)**

322. LA Waterkeeper re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

323. Royal White has failed to collect storm water samples as required by the General Permit, including without limitation failing to collect sufficient samples during qualifying storm events during the 2018–2019, 2019–2020, 2020–2021, and

2021–2022, and 2022–2023 permit years.

324. Royal White has failed to comply with the General Permit's Water Quality Based Corrective Actions. General Permit, § XX.B.

325. Royal White has not developed and implemented a legally adequate monitoring and reporting program, or Monitoring Implementation Plan, for the Facility.

326. Royal White's violations of the General Permit's Monitoring Implementation Plan mandate are ongoing and continuous.

327. Each day since August 21, 2018, that Royal White has not developed and implemented a lawful Monitoring Implementation Plan for the Facility and all areas of industrial activity in violation of the General Permit is a separate and distinct violation of the General Permit and section 301(a) of the Act. 33 U.S.C. § 1311(a).

328. Royal White is subject to an assessment of civil penalties for each and every violation of the Act occurring from August 21, 2018 to the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

329. An action for injunctive relief is authorized by section 505(a) of the Act. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

330. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, LA Waterkeeper prays for judgment against Royal White as set

1    forth hereafter.

2                          **RELIEF REQUESTED**

3         WHEREFORE, LA Waterkeeper respectfully requests that this Court grant the

4    following relief:

5         a.      Declare Royal White to have violated, and to be in violation of, the

6    General Permit and Act as alleged herein for its unpermitted discharges of pollutants;

7         b.      A court order declaring Royal White to have violated and to be in

8    violation of Section 301(a) of the CWA for discharging pollutants in violation of a

9    permit issued pursuant to Section 402 of the CWA, and for failing to comply with the

10   substantive and procedural requirements of the Industrial Storm Water Permit;

11        c.      A court order requiring that the Royal White apply for and obtain

12   coverage under the General Permit for the discharges of pollutants as required by

13   Section 301(a) of the CWA;

14        d.      Enjoin Royal White from discharging polluted storm water from the

15   Facility except as authorized by the General Permit;

16        e.      Order Royal White to immediately implement storm water pollution

17   control technologies and measures that achieve BAT/BCT-level pollutant reductions,

18   and that prevent pollutants in the Facility's storm water discharges from contributing to

19   violations of any water quality standards;

20        f.      Order Royal White to prepare a Pollution Prevention Plan consistent with

21   the General Permit's requirements, and implement procedures to regularly review and

22   update the Pollution Prevention Plan to ensure ongoing compliance with Pollution

23   Prevention Plan requirements;

g.      Order Royal White to prepare a Monitoring Implementation Plan consistent with the General Permit's requirements, and comply with the General Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

h.      Order Royal White to pay civil penalties of up to $64,618.00 for each violation alleged herein pursuant to sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a); 40 C.F.R. §§ 19.1–.4;

i.      Order Royal White to take appropriate actions to restore the quality of waters impaired or adversely affected by its activities;

j.      Award LA Waterkeeper's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

k.      Award any such other and further relief deemed appropriate by the Court.

DATED: October 24, 2023          Respectfully submitted,

By:     /s/ Daniel Cooper
        Daniel Cooper
        SYCAMORE LAW, INC.
        Attorney for Plaintiff