Daniel Cooper (SBN 153576)
daniel@sycamore.law
Jesse C. Swanhuyser (SBN 282186)
jesse@sycamore.law
Jessica D. Hollinger (SBN 344211)
jessica@sycamore.law
SYCAMORE LAW, INC.
1004 O'Reilly Avenue, Ste. 100
San Francisco, CA 94129
Tel: (415) 360-2962

Barak Kamelgard (SBN 298822)
Email: barak@lawaterkeeper.org
Benjamin Harris (SBN 313193)
Email: ben@lawaterkeeper.org
LOS ANGELES WATERKEEPER
360 E 2nd Street, Suite 250
Los Angeles, CA 90012
Phone: (310) 394-6162

Attorneys for Plaintiff
LOS ANGELES WATERKEEPER

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER, a California non-profit association,<br><br>Plaintiff,<br><br>v.<br><br>ROYAL WHITE CEMENT, INC an Illinois corporation,<br><br>Defendant. | Case No.: 2:23-cv-08983<br><br>~~[proposed]~~ **CONSENT DECREE**<br><br>Federal Water Pollution Control Act, <u>33 U.S.C. §§ 1251</u> to 1387 |

# CONSENT DECREE

**WHEREAS,** Plaintiff Los Angeles Waterkeeper ("LA Waterkeeper" or "Plaintiff") is a 501(c)(3) non-profit public benefit corporation organized under the laws of the State of California, with its main office in Los Angeles, California;

**WHEREAS,** LA Waterkeeper is dedicated to the preservation, protection and defense of the surface, ground, coastal and ocean waters of Los Angeles County from all sources of pollution and degradation;

**WHEREAS,** Defendant Royal White Cement, Inc. ("Royal White" or "Defendant") owns and operates a facility at 645 N. Pioneer Avenue, Wilmington, CA 90744, under Waste Discharger Identification number 4 19I030492 ("Facility");

**WHEREAS,** the Facility's industrial activities consist of receiving, packaging, and distributing bulk and packaged cement products. The Facility falls within the definitions of 40 C.F.R. Chapter I, Subchapter N ("Subchapter N"), Part 411 (cement manufacturing materials storage piles), Standard Industrial Classification ("SIC") SIC code 3241 (manufacturing hydraulic cement, including portland, natural, masonry, and pozzolana cements), and secondary SIC code 4225 (general warehousing and storage);

**WHEREAS,** the Facility is approximately 40,000 square feet with an annual output capacity of 50,000 tons and whereas LA Waterkeeper alleges that the Facility's industrial operations result in the accumulation of cementitious material throughout the Facility's outdoor areas, on roofs, on public streets, and in neighboring properties;

**WHEREAS,** storm water discharges associated with industrial activity at the Facility are regulated by the National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 [State Water Resources Control Board], Water Quality Order 2014-0057-DWQ, as amended by Order Nos. 2015-0122-DWQ and 2018-0028-DWQ, and as further amended or superseded from time to time

1  ("General Permit" or "Permit")[1], and the Federal Water Pollution Control Act, <u>33</u>
2  <u>U.S.C. §§ 1251</u>, *et seq.* ("Clean Water Act" or "CWA"), Sections 301(a) and 402, <u>33</u>
3  <u>U.S.C. §§ 1311(a)</u>, <u>1342</u>;

4      **WHEREAS**, LA Waterkeeper alleges Defendant's operations at the Facility
5  result in discharges of pollutants into waters of the United States and are regulated by
6  the Clean Water Act Sections 301(a) and 402. <u>33 U.S.C. §§ 1311(a)</u>, <u>1342</u>;

7      **WHEREAS**, the General Permit requires all permittees, including Royal
8  White, to comply with, inter alia, the following mandates: (1) develop and implement
9  a storm water pollution prevention plan ("SWPPP") and a storm water monitoring
10  implementation plan ("MIP"), (2) control pollutant discharges using, as applicable,
11  best available technology economically achievable ("BAT") or best conventional
12  pollutant control technology ("BCT") (collectively, "BAT/BCT") to prevent or
13  reduce pollutants through the development and application of Best Management
14  Practices ("BMPs"), which must be detailed in and timely updated in the SWPPP, (3)
15  reduce and eliminate discharges necessary to comply with any and all applicable
16  Water Quality Standards ("WQS"), and (4) implement a monitoring and reporting
17  program, including the MIP, designed to assess compliance with the Permit;

18      **WHEREAS**, publicly available information, including the State Board's online
19  database for NPDES program compliance filings, SMARTS, indicated that as of
20  August 21, 2023, the Facility had not filed a Notice of Intent ("NOI") with the State
21  Board and LA Waterkeeper alleges that Royal White has been releasing polluted
22  storm water discharges without NPDES permit coverage, since at least August 21,
23  2018;

24

---

25  [1] Any references to the "General Permit" or "Permit" herein shall be to the then-effective version, regardless of whether
26  such changes are the result of amendments, revisions, reissuance, or similar modification of material terms. Any
    reference in this Consent Decree to specific sections or subsections of the General Permit that are moved, modified, or
27  otherwise changed in a subsequent version of the General Permit shall be to such subsequent reference(s) as if set forth
    herein, *e.g.*, the current §XI.B.6.c may be renumbered as §XI.B.7.c, combined into the current §XI.B.6.d, or split into a
28  new §XI.B.6.c and §XI.B.6.d.

---

**WHEREAS**, on August 21, 2023, LA Waterkeeper issued a notice of intent to file suit ("60-Day Notice Letter") to Royal White, its registered agent, the Administrator of the United States Environmental Protection Agency ("EPA"), the Executive Director of the State Water Resources Control Board ("State Board"), the Executive Director Los Angeles Regional Water Quality Control Board ("Regional Board"), and the Regional Administrator of EPA Region IX, due to the Facility's alleged ongoing storm water discharges in violation of established standards and status as a non-filer, alleging violations of the Clean Water Act and the General Permit Water Quality Order 2014-0057-DWQ, as amended by Order Nos. 2015-0122-DWQ and 2018-0028-DWQ incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) Total Maximum Daily Load Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use, at the Facility;

**WHEREAS**, the Facility filed an NOI on November 14, 2023, following receipt of LA Waterkeeper's 60-Day Notice Letter;

**WHEREAS**, on October 24, 2023, LA Waterkeeper filed a complaint against Royal White in the Central District of California, Civil Case No. 2:23-cv-08983 ("Complaint");

**WHEREAS**, LA Waterkeeper's Complaint alleged violations of the General Permit and the Clean Water Act for Defendant's alleged unpermitted discharges of pollutants into storm drains and surface waters, including the Los Angeles Harbor Consolidated Slip, Greater Los Angeles/Long Beach Harbor Waters, San Pedro Bay, as well as the beaches and nearshore and coastal waters of the Pacific Ocean between Santa Monica and Huntington Beach (collectively "Receiving Waters"), and for alleged violations of the General Permit;

**WHEREAS**, Royal White denies the allegations set forth in the 60-Day Notice Letter and the Complaint;

**WHEREAS**, Plaintiff and Defendant (collectively "Settling Parties" or "Parties") agree that it is in their mutual interest to enter into a Consent Decree setting forth terms and conditions appropriate to resolving the allegations set forth in the 60-Day Notice Letter and Complaint without further proceedings;

**WHEREAS**, all actions taken by Defendant pursuant to this Consent Decree shall be made in compliance with all applicable federal, state and local laws, rules and regulations.

**NOW, THEREFORE, IT IS HEREBY STIPULATED BETWEEN THE SETTLING PARTIES AND ORDERED AND DECREED BY THE COURT AS FOLLOWS:**

1. The Court has jurisdiction over the subject matter of this action pursuant to Section 505(a)(1)(A) of the CWA, 33 U.S.C. § 1365(a)(1)(A).

2. Venue is appropriate in the Central District Court pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the Facility at which the alleged violations are taking place is located within this District.

3. The Complaint states a claim upon which relief may be granted against Defendant pursuant to Section 505 of the CWA, 33 U.S.C. § 1365.

4. LA Waterkeeper has standing to bring this action.

5. The Court shall retain jurisdiction over this action for purposes of interpreting, modifying, or enforcing the terms of this Consent Decree, or as long thereafter as necessary for the Court to resolve any motion to enforce this Consent Decree.

**I.    OBJECTIVES**

6. It is the express purpose of the Settling Parties through this Consent Decree to further the objectives of the Clean Water Act, and to resolve all issues alleged by LA Waterkeeper in its 60-Day Notice Letter and Complaint. These objectives include compliance with the provisions of this Consent Decree,

compliance with all terms and conditions of the General Permit, and compliance with the CWA as it applies to the Facility.

7.      In light of these objectives and as set forth fully below, Defendant agrees to comply with the provisions of this Consent Decree, terms and conditions of the General Permit, and all applicable sections of the CWA at the Facility.

## II.    AGENCY REVIEW AND CONSENT DECREE TERM

### A.    AGENCY REVIEW OF CONSENT DECREE

8.      <u>Agency Review</u>. Plaintiff shall submit this Consent Decree to the United States Department of Justice and the EPA (the "Federal Agencies") for agency review consistent with <u>40 C.F.R. § 135.5</u>. The agency review period expires forty-five (45) calendar days after receipt by the Federal Agencies, as evidenced by certified return receipts, or upon the date that the Federal Agencies provide a no objection letter, whichever is earlier ("Agency Review Period"). In the event that the Federal Agencies object to entry of this Consent Decree or to any portion of this Consent Decree, the Parties agree to meet and confer to attempt to resolve the issue(s) raised by the Federal Agencies. If the Parties are unable to resolve any issue(s) raised by the Federal Agencies in their comments, the Parties agree to expeditiously seek a settlement conference with the assigned Magistrate Judge to resolve any issue(s).

9.      <u>Court Notice</u>. Plaintiff shall notify the Court of the receipt date by the Federal Agencies, as required by <u>40 C.F.R. § 135.5</u>, in order to coordinate the Court's calendar with the 45-day review period.

10.     <u>Entry of Consent Decree</u>. Following the expiration of the Agency Review Period, Plaintiff shall submit the Consent Decree to the Court for entry.

### B.    DEFINITIONS

11.     Unless otherwise expressly defined herein, terms used in this Consent Decree which are defined in the CWA or in regulations or rules promulgated under the CWA have the meaning assigned to them in the statutes or regulations or rules.

Whenever terms listed below are used in this Consent Decree, whether or not capitalized, the following definitions apply:

    a.    "BAT" means the Best Available Technology Economically Achievable.

    b.    "BCT" means the Best Conventional Pollutant Control Technology.

    c.    "BMPs" means Best Management Practices as currently defined in Attachment C (Glossary) of the General Permit.

    d.    "Consent Decree" means this Consent Decree and any attachments or documents incorporated by reference.

    e.    "Day" means a calendar day. In computing any period of time under this Consent Decree, where the last day of such period is a Saturday, Sunday, or Federal or State Holiday, the period runs until the close of business on the next day that is not a Saturday, Sunday, or Federal or State Holiday.

    f.    "Discharge Point" means each discharge location designated in the then-current SWPPP for the Facility including, without limitation, discharge points: S-1 at Outfall 001 at the northeast side of the property ("Discharge Point 1"), and S-2 at Outfall 002 at the southeast side of the property ("Discharge Point 2").

    g.    "Design Storm Standard" means the standards set forth in Section X.H.6 of the Permit ("Design Storm Standards for Treatment Control BMPs"), which is for the Facility a storm event generating up to a maximum precipitation of 0.53 inches in 24-hours.

    h.    "Effective Date" means the date this Consent Decree is approved and entered by the Court.

i.    "MIP" means a Monitoring Implementation Plan.

j.    "North Pioneer Inlets" means the two (2) municipal storm water inlet drains at North Pioneer Avenue at the corner shared with G Street.

k.    "PPT" means Pollution Prevention Team.

l.    "Qualified Industrial Storm Water Practitioner" or "QISP" shall have the definition set forth in Section IX.A of the General Permit.

m.    "Qualifying Storm Event" or "QSE" shall have the definition set forth in Section XI.B of the General Permit.

n.    "Reporting Year" means the period from July 1 of a given calendar year to June 30 of the following calendar year.

o.    "SMARTS" means the California State Water Resources Control Board's Stormwater Multiple Application and Report Tracking System.

p.    "SWPPP" means a Storm Water Pollution Prevention Plan.

q.    "Term" means the period between the Effective Date and the "Termination Date."

r.    "Termination Date" means the latest of:

       i.    June 30 following five (5) years from the Effective Date, following completion of all payments and affirmative duties required by this Consent Decree;

       ii.    forty-five (45) days from the conclusion of any proceeding or process to enforce the Consent Decree; or

       iii.    forty-five (45) days from Royal White's completion of all payments and affirmative duties required by this Consent Decree; or

iv. Notwithstanding the foregoing, the Termination Date shall be earlier than the dates in Paragraphs 11r.i-iii if Royal White: (1) ceases industrial operations at the Facility; (2) eliminates all sources of industrial stormwater pollution at the site; (3) files a Notice of Termination ("NOT") under the Permit; and (4) receives approval by the Regional Board of the NOT. In such circumstances, the Termination Date shall be determined according to the following procedure: at least fifteen (15) days prior to submitting a NOT to the Regional Board, Royal White shall provide written notice to LA Waterkeeper of its intent to file a NOT. The notice shall include written and photographic verification that the Facility has ceased operations, completed closure activities, and removed all industrial-related pollutants. LA Waterkeeper shall copy Royal White on any correspondence to the Regional Board regarding the NOT and shall include Royal White in any telephone calls, communications or meetings with the Regional Board relating to the NOT. Within five (5) days of the Regional Board approval of the NOT, Royal White shall provide written notification to LA Waterkeeper of the approval of the NOT, and the Termination Date shall be five (5) days after such written notification to LA Waterkeeper.

s. "Wet Season" means the period beginning October 1st of any given calendar year and ending June 30th of the following calendar year.

## III. COMMITMENTS OF THE SETTLING PARTIES

### A. NON-STORM WATER DISCHARGE PROHIBITION

12. Any unauthorized non-storm water discharge, as defined in the General Permit, shall be a violation of this Consent Decree.

### B. LOCAL INDUSTRIAL WASTEWATER PERMIT

13. <u>Industrial Wastewater Permit Application</u>. As soon as possible but no later than October 1, 2024, Royal White shall restrict flow and install gauging at the discharge point from the detention pond to the sanitary sewer to ensure Royal White discharges no more than 200 gpd consistent with Section 64.30 of the Los Angeles Municipal Code. Royal White shall prepare a log documenting the daily gauging data from any discharge from the detention pond, and shall provide the log to LA Waterkeeper, within 21 (twenty-one) days of a written request by LA Waterkeeper for such data.

### C. INTERIM STORM WATER POLLUTION CONTROLS

14. <u>Current and Additional Best Management Practices</u>: Defendant shall (1) develop and implement BMPs identified herein, and (2) develop and implement additional BMPs necessary to comply with the provisions of this Consent Decree and the General Permit, including but not limited to those that achieve BAT/BCT. In addition, the General Permit Receiving Water Limitations require that discharges from the Facility "not cause or contribute to an exceedance of any applicable water quality standards" contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. Defendant shall develop and implement BMPs necessary to comply with the General Permit requirement to achieve compliance with BAT/BCT standards, to comply with the applicable water quality standards, and to prevent or reduce contamination in storm water discharges from the Facility in compliance with this Consent Decree.

15.    <u>Rain Gauge/Sensor</u>. As soon as possible, but no later than October 1, 2024, Defendant shall install and maintain an electronic rain gauge or sensor at the Facility. The rain gauge/sensor shall be capable of measuring precipitation down to at least 0.1 inches, and record start/stop times and non-cumulative precipitation for each rain event. During the Term, Defendant shall collect data using the gauge/sensor for all precipitation events to the nearest 0.1 inch, including start/stop times. Data from the rain gauge/sensor shall be conclusive of precipitation quantities and timing for purposes of this Consent Decree. Royal White shall provide rain gauge/sensor data within 21 (twenty-one) days of a written request by LA Waterkeeper for such data.

16.    <u>Source Control</u>. As soon as possible but no later than October 1, 2024, Royal White shall store all materials and equipment in a manner that complies with the Permit.

17.    <u>Storm Water Filtration</u>.  As soon as possible, but no later than October 1, 2024, Royal White shall install one of the following improved multi-media storm water filter socks at each storm water Discharge Point at the Facility. Royal White shall install either:

      a.  BiocharBAZIC™ using storm water treatment media that is a blend of StormwaterBIOCHAR™, and StormwaterZEOLITE™;
          https://stormwaterbiochar.com/medias/biocharbazic/;
          or:

      b.  BiocharPEAT™ using storm water treatment media that is a blend of StormwaterBIOCHAR™, StormwaterPEAT™ and StormwaterSHALE™;
          https://stormwaterbiochar.com/medias/biochar-peat/.

Royal White shall configure such socks to achieve maximum contact time with storm water prior to discharge, *i.e.,* in multiple layers and/or overlapping formations. Royal White shall, thereafter, employ and secure socks in the same manner annually

prior to the start of each Wet Season, no later than September 15th. During each Wet Season, as necessary, Royal White shall replace the socks when degraded or ineffective, including without limitation when there are rips, tears or other visual damage, and/or sampling data demonstrating the socks are not sufficiently reducing pollutant concentrations.

18.    <u>Driveway Berm Installation</u>. As soon as possible, but no later than October 1, 2024, Royal White shall install flexible EDPM rubber berms[2], approximately six (6) feet in length and using as few joints as possible, at the entrances to the driveways on North Pioneer Avenue consistent with Exhibit 1. Royal White shall use silicone caulk to fill the gaps between the rubber berm joints and attach the rubber berm to the ground at the time of installation sufficient to contain all storm water up to and including the Design Storm Standard. Royal White shall ensure that rubber berms installed at the entrances to the driveways are sufficient to direct discharge, up to and including the Design Storm Standard, to the filter socks described in Paragraph 17.

19.    <u>Shipping Container Pollution Control</u>. As soon as possible, but no later than October 1, 2024, Royal White shall cease any and all unloading or loading activities on North Pioneer Avenue. Royal White shall empty and clean any and all shipping containers stored on North Pioneer Avenue.

20.    <u>Dust Control Inspections</u>. As soon as possible, but no later than October 1, 2024, Royal White shall (a) inspect the storage warehouse, operating warehouse, and truck loading area for gaps through which cement dust might pass and (b) fill, tighten, or close gaps or replace damaged materials accordingly. Royal White shall inspect the outdoor truck loader adjacent to the operating warehouse for integrity,

---

[2] EDPM rubber is a type of long-lasting synthetic rubber made from ethylene, propylene, and a diene comonomer, that is designed to withstand harsh weather conditions.

including shrouding and nozzles, through which cement dust might pass and fill, tighten, or close any gaps or replace damaged materials accordingly.

21. <u>Truck Loading Dust Control Measures</u>. As soon as possible, but no later than October 1, 2024, Royal White shall order replacement strip curtains or other protective material on the equipment that loads product into trucks adjacent to the main warehouse and shall be installed as soon thereafter as possible. As necessary, Royal White shall replace or repair such strip curtain when degraded or ineffective, including without limitation when there are rips, tears or other visual damage, and/or cement dust is otherwise escaping. Royal White shall ensure that the forklift dedicated to the truck loading area is stored indoors at all times to prevent pollutant tracking.

22. <u>Truck Loading Protocol.</u> As soon as possible, but no later than October 1, 2024, Royal White shall update its truck loading protocol to require that all truck-loading machinery users extend the truck-loading nozzles carefully into the open hatch of the of receiving trucks before fillings, ensuring the cone of nozzle is entirely inside of the truck to prevent spillage. Royal White shall also install highly visible signage at the entrance of the truck loading area to inform all truck-loading machinery users of the proper truck loading protocols and will include the protocols as part of its annual employee training.

23. <u>Truck Scale Pollution Control Measures.</u> As soon as possible, but no later than October 1, 2024, Royal White shall (a) cover the drain grate on the north side of the truck scales with a rubber drain cover to direct storm water runoff sheets to Discharge Point 1; (b) pump any residual storm water from the sump pit to the surface; (c) redirect drainage from the sump pit in the truck scales, including residual water removed using a sump pump, to the treatment device at Discharge Point 1; and (d) disconnect and cap with a PVC cover the pipe that discharges from the sump to the public right of way thereby eliminating former S-3 (Discharge Point 3).

13

24.  Vehicle Pollution Mitigation. As soon as possible, but no later than October 1, 2024, Royal White shall require all vehicles to enter the Facility at the northeastern gate and exit at the southeastern gate, to minimize debris tracking. Royal White shall install highly visible signage at both gates to inform drivers of this requirement.

25.  Storage Warehouse Dust Control Measures. As soon as possible, but no later than October 1, 2024, Royal White shall obtain bids for installing permanent tarps on the south, east, and west sides of the canopied area located in the center portion of the site and the tarps shall be installed as soon thereafter as possible. Royal White shall maintain tarp coverage of the canopied area and shall, as necessary, install additional coverage mechanisms to reduce any escape of cementitious materials from the warehouse.

26.  Site Resurfacing. As soon as possible, but no later than October 1, 2024, Royal White shall patch, pave, or otherwise resurface areas (larger than 1-inch wide and six (6) inches long) of degraded pavement or asphalt throughout the Facility.

### D.  POST 2023-2024 REPORTING YEAR STORM WATER POLLUTION CONTROLS

27.  Storage Area Berm Installation. As soon as possible but no later than October 1, 2024, Royal White shall also install EDPM flexible rubber berms at the entrances of the storage warehouse to doors, to restrict cement dust passage and tracking, at each and every entrance to the storage warehouse. Royal White shall use silicone caulk to fill the gaps between the rubber berm joints and attach the rubber berm to the ground at the time of installation.

28.  Sweeping Program. As soon as possible, but no later than October 1, 2024, Royal White shall implement a daily sweeping program using their current sweeper.  During the Wet Season, Royal White shall conduct weekly sweeping with a vacuum sweeper with the capacity to collect and retain PM-10 (10 μm) particles, and

within twenty-four (24) hours of a Forecasted Rain Event (as defined below). During the dry season, Royal White shall conduct monthly sweeping with a vacuum sweeper with the capacity to collect and retain PM-10 (10 μm) particles.  Royal White shall employ hand sweeping and/or vacuuming on the same schedule in areas a mechanical sweeper cannot access.

29.  <u>Wet Season Protocol</u>. As soon as possible, but no later than October 1, 2024, Royal White shall implement the following protocols:

a.  Within twenty-four (24) hours prior to a forecasted rain event of greater than fifty (50) percent probability as determined by the National Oceanic and Atmospheric Administration (http://forecast.weather.gov/) for "Consolidated Slip, Los Angeles, CA"[3] (a "Forecasted Rain Event"), Royal White shall cover all industrial materials, debris and scrap bins, and trash cans not at the time in use with tarps, lids, or other coverings sufficient to prevent exposure to rainfall, including without limitation those stored outside and where roof protection is inadequate, or otherwise move them into a covered structure adequate to prevent exposure to rainfall; and

b.  No significant maintenance activities may occur during wet weather, unless: (a) such maintenance is required for safe operation of the Facility, *e.g.*, the forklift breaks down in a location that prevents ingress/egress; (b) maintenance activities occur only in designated work areas or beneath covered maintenance areas; and (c) action is immediately taken to contain, capture, and clean up any discharge or spills of waste fluids related to maintenance

---

[3] Available at https://marine.weather.gov/MapClick.php?lat=33.7753&lon=-118.2451.

activities that must be performed outdoors. However, Royal White shall be permitted to continue operating its Facility during wet weather.

30.   Within fourteen (14) days of each of the above BMPs listed in Paragraphs 13-29 being implemented, Royal White shall confirm to LA Waterkeeper in writing, with photographs, that such BMP has been implemented and, with respect to the advanced treatment systems, is operational (if it is required), as set forth below.

### E.   MONITORING AND REPORTING

31.   <u>Heightened MIP Requirements</u>. Beginning with the 2024-2025 Reporting Year, Defendant shall develop and implement an expanded MIP that includes storm water sample collection and analysis at all Discharge Points, from six (6) Qualifying Storm Events, including, at minimum, the three (3) Qualifying Storm Events during the first half of the Reporting Year and the three (3) Qualifying Storm Events during the second half of the Reporting Year, for the first two (2) Reporting Years of this Consent Decree. Such sampling and analysis shall comply with General Permit § XI and shall take place within the four (4) hour period required by the General Permit § XI.B.5.  Royal White shall collect storm water samples from three QSEs (if they occurred during each reporting period) in each half of the Reporting Year. If Royal White fails to sample three (3) QSEs during the first half of the Reporting Year or three (3) QSEs during the second half of the Reporting Year, the lack of QSEs will be documented in accordance with Paragraphs 49 and 50 of this Agreement.

32.   <u>Sample Analysis</u>. All samples collected shall be analyzed for all parameters required by General Permit § XI.B.6, including without limitation those pollutants listed in Table 1.

33.   <u>Adding Parameters to MIP</u>. In the event that Defendant intends to analyze storm water samples for any additional parameters that are listed in 40 C.F.R.

§ 131.38 and/or in the General Permit for any reason—including without limitation as a result of changed operations, a revised pollutant source assessment, or a new mandate from a regulatory agency—such parameter shall be incorporated into this Consent Decree as if listed in Table 1 for all purposes, including any Action Plan requirements (defined below). Defendant shall immediately notify LA Waterkeeper of its intent to conduct sampling for any such additional parameters and the Parties shall meet and confer regarding the applicable Table 1 limit for such purposes within ten (10) days of such notification.

34.  <u>Removing Parameters from MIP</u>. If sample analyses from four (4) consecutive Qualifying Storm Events yield are below the numeric limits levels of any pollutant listed in Table 1 from all Discharge Points (as designated in the then-effective SWPPP), Royal White may discontinue testing for that/those parameter(s) without violating this Consent Decree.

35.  <u>Laboratory and Holding Time</u>. Except for pH samples, Defendant shall deliver all samples to a California-certified environmental laboratory for analysis within allowable hold times, pursuant to 40 C.F.R. Part 136. Analysis of pH will be completed onsite using a portable instrument that has been calibrated according to the manufacturer's instructions.

36.  <u>Detection Limit</u>. Defendant shall request that the laboratory use analytical methods adequate to detect the individual contaminants at or below the values specified in the General Permit and Table 1 below.

37.  <u>Reporting</u>. Defendant shall provide complete laboratory results of all samples collected at the Facility to SMARTS in accordance with the General Permit, and shall provide copies to LA Waterkeeper within five (5) days of receiving the laboratory report with the results.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## F. ADVANCED TREATMENT AND ACTION PLAN REQUIREMENTS

38.  Table 1 Numeric Limits. Defendant shall develop and implement BMPs to reduce pollutants in storm water at the Facility to levels below those in Table 1.

### TABLE 1 [4]

| PARAMETER | NUMERIC LIMIT | SOURCE |
|---|---|---|
| PH | 6.0-9.0SU* (INSTANTANEOUS) | EPA BENCHMARK/NAL |
| OIL & GREASE | 15 MG/L** (ANNUAL); 25 MG/L (INSTANTANEOUS) | NAL |
| TSS | 100 MG/L (ANNUAL); 400 MG/L (INSTANTANEOUS) | EPA BENCHMARK/NAL |
| IRON (TOTAL) | 1.0 MG/L (ANNUAL) | NAL |
| ALUMINUM (TOTAL) | 0.75 MG/L (ANNUAL) | NAL |
| COPPER (TOTAL) | 0.0332 MG/L (ANNUAL) | NAL |
| ZINC (TOTAL) | 0.26 MG/L (ANNUAL | NAL |

* s.u. = standard units.
** mg/L = milligrams per liter.

39.  Advanced Treatment Plan Trigger. An "Advanced Treatment Plan Trigger" is defined as follows: where the average annual concentration of a parameter identified in Table 1 from the Facility in any Reporting Year exceeds the applicable annual numeric limit contained in Table 1, or where the concentration of any

---

[4] The numeric limits listed in Table 1 are for reference only, and the Table 1 limit for each parameter shall be the then-effective limit provided by the applicable source, e.g., if the source for aluminum is listed as its NAL and the NAL for aluminum is either increased to 0.80 mg/L or decreased to 0.70 mg/L, such new NAL, and not 0.75 mg/L, shall be used as the Table 1 limit for the purposes of this Consent Decree as if set forth herein. If the source of a limit in Table 1 is revised to no longer provide a limit for a given parameter, e.g., the NAL for aluminum being removed, then the Parties shall meet and confer regarding the applicable Table 1 limit for such parameter for the purposes of this Consent Decree.

parameter identified in Table 1 in any two (2) storm water samples from the Facility in a given Reporting Year exceeds the applicable instantaneous limit contained in Table 1.

40. <u>Advanced Treatment Plan</u>. If storm water samples collected from the Effective Date through June 30, 2025, demonstrate one or more Advanced Treatment Plan Triggers, as defined in Paragraph 39 above, then Royal White shall develop and implement by September 15, 2025, an advanced treatment system that meets the requirements of Paragraph 41 below and ensures compliance with the numeric limits set out in Table 1.  If advanced treatment is required based on this Paragraph, then by July 15, 2025, Royal White shall submit to LA Waterkeeper a plan for advanced treatment ("Advanced Treatment Plan") that meets the requirements of Paragraph 41 below and ensures compliance with the numeric limits set out in Table 1. LA Waterkeeper shall provide to Royal White proposed revisions, if any, on the Advanced Treatment Plan within twenty-one (21) days of receipt. Within fourteen (14) days of receiving LA Waterkeeper's proposed revisions to the Advanced Treatment Plan, Royal White shall consider each of LA Waterkeeper's recommended revisions and accept them or justify in writing why any comment is not incorporated.

41. <u>Advanced Treatment Requirements</u>. If an advanced treatment system is required based on Paragraph 40 of this Consent Decree, Royal White shall install an advanced treatment system at each Discharge Point exceeding an Advanced Treatment Plan Trigger that employs BAT/BCT (e.g., polymer- or electrocoagulation-assisted filtration) and is proven to be consistently capable of meeting the specified numeric limits set out in Table 1, for all storm water discharges up to, and including, the Design Storm Standard from the Facility. Royal White shall select a treatment system to address the parameter exceeded and shall consider treatment systems marketed by companies such as Clearwater Services, Clear Creek Systems, WaterTectonics, and StormwateRx. If a polymer-based system is selected,

1    the specific polymeric agent shall be chosen based on bench-scale testing utilizing

2    storm water runoff from the facility.

3        42.    <u>Action Plan Trigger</u>. An "Action Plan Trigger" is defined as any of the

4    following:

5            a.    Where the sum of the concentration of any parameter identified in

6                Table 1 in all other storm water samples for the same pollutant

7                collected at the Facility at that point in the same Reporting Year

8                demonstrate that it is inevitable that the annual average for that

9                parameter will exceed the applicable annual numeric limit

10                specified in Table 1 in that Reporting Year;[5]

11            b.    If any parameter identified in Table 1 is sampled in fewer QSEs

12                than required pursuant to Paragraph 31 above, and there was

13                otherwise no Action Plan Trigger for that parameter pursuant to

14                Paragraph 42.a above, then where the average concentration of

15                that parameter from all storm water samples during that Reporting

16                Year exceeds the applicable annual Numeric Limit specified in

17                Table 1;[6] or

18            c.    Where the concentration of any pollutant in any two (2) storm

19                water samples from the Facility collected in a Reporting Year

20                exceeds the applicable instantaneous numeric limit contained in

21                Table 1.

22

23

24    ───────────────

25    [5] I.e., there is an "Action Plan Trigger" when the sum of all samples for that parameter at that point in the Reporting
    Year is high enough that the facility will exceed the annual numeric limit even if all remaining samples for the

26    parameter that Reporting Year are non-detects (based on no more than six QSEs in the first two Reporting Years of the
    Term, and no more than four QSEs in the remaining Reporting Years).

27    [6] I.e., if pollutant is sampled in fewer than six QSEs in the first two Reporting Years of the Term or four QSEs in the
    remaining Reporting Years, there is an "Action Plan Trigger" the average concentration of the samples taken for that

28    pollutant exceed the annual numeric limit in Table 1.

CONSENT DECREE                    20                    Case No. 2:23-cv-08983

43.   Action Plan. Regardless of whether an advanced treatment system is installed pursuant to Paragraphs 40-41 above, beginning September 15, 2025, and for the remainder of the Term, if (a) Defendant has an unauthorized non-storm water discharge in violation of Paragraph 12, (b) storm water samples required by this Consent Decree demonstrate any Action Plan Trigger as defined in Paragraph 42 above, (c) the Facility discharges at any location other than the Discharge Locations identified in the then current SWPPP, or (d) after an Advanced Treatment System is installed as set forth above, if ever, the Facility discharges untreated storm water during a storm event smaller than a Design Storm, as applicable, Defendant shall prepare and submit to LA Waterkeeper a plan that shall prevent future Action Plan Triggers, prevent discharges other than at Discharge Locations, comply with the Design Storm Standard, and/or comply with the non-storm water discharge prohibition ("Action Plan").[7] If based on an Action Plan Trigger, the complete Action Plan shall be submitted to LA Waterkeeper according to the following:

 i. by February 1 of each year for any Action Plan Trigger pursuant to Paragraphs 42.a or 42.c above based on sampling conducted from July 1 - December 31 of the preceding year, or for any Action Plan triggered by this Paragraph 43 (a) (c) or (d) based on events occurring from July 1 - December 31 of the preceding year.

 ii. or by July 30 of each year for an Action Plan Trigger pursuant to Paragraphs 42.a, 42.b or 42.c above based on sampling conducted from January 1- June 30 of each year; or for any Action Plan triggered by this Paragraph 43 (a) (c) or (d) based on events occurring from January 1- June 30 of the preceding year.

---

[7] The "Action Plan" discussed in this Consent Decree is a separate and distinct requirement from any "Action Plan" or Exceedance Response Actions discussed in the General Permit, and compliance with the "Action Plan" requirements of the Consent Decree is, therefore, separate and distinct from compliance with any "Action Plan" or Exceedance Response Action requirements of the General Permit.

44.  <u>Action Plan Requirements</u>. Each complete Action Plan submitted shall include at a minimum: (1) the identification of the applicable unauthorized non-storm water discharge, discharge other than at a Discharge Location, applicable discharge in smaller than a Design Storm, and/or contaminant(s) discharged in excess of the numeric limit(s); (2) an assessment of the cause/source of any unauthorized non-storm water discharge, discharge other than at a Discharge Location, discharge in smaller than a Design Storm, and/or the contaminant(s)/limit(s) exceeded; (3) a narrative assessment of the effectiveness of existing BMPs; (4) the identification of additional BMPs, including detailed design plans and calculations, that Defendant will implement to achieve compliance with the unauthorized non-storm water discharge prohibition, Discharge Locations, Design Storm Standard, and/or applicable numeric limit(s); and (5) time schedules for implementation of the proposed BMPs.

45.  <u>Action Plan Implementation</u>. The time schedule(s) for implementation of BMPs described in any Action Plan shall ensure that all BMPs are implemented as soon as possible, but in no event later than ninety (90) days following the submission of the Action Plan, unless a later implementation date is mutually agreed upon by the Settling Parties. Within seven (7) days of each of the BMPs set forth in the Action Plan being implemented, Defendant shall confirm to LA Waterkeeper in writing, with photographs, that such BMP has been implemented as set forth in the Action Plan.

46.  <u>Action Plan Review</u>. LA Waterkeeper shall have thirty (30) days upon receipt of Defendant's complete Action Plan to provide Defendant with comments. Within fourteen (14) days of receiving LA Waterkeeper's proposed revisions to an Action Plan, Defendant shall consider each of LA Waterkeeper's recommended revisions and accept them or justify in writing why any comment is not incorporated. Action Plan(s) developed and implemented pursuant to this Consent Decree are an obligation of this Consent Decree. Any disputes as to the adequacy of an Action Plan

shall be resolved pursuant to the dispute resolution provisions of this Consent Decree, set out in Section IV below. Disputes regarding the adequacy of a particular BMP shall not impact the schedule for implementing any other BMP set forth in the Action Plan.

47. <u>Updating SWPPP with Action Plan Changes</u>. Defendant shall revise the then-current SWPPP to reflect any installation of Advanced Treatment or changes required by the Action Plan, as set forth in Paragraphs 42-45 above.

48. <u>Advanced Treatment Plan and Action Plan Payments</u>. Defendant shall pay Five Thousand Dollars ($5,000.00) for any Advanced Treatment Plans submitted to LA Waterkeeper pursuant to Paragraph 40 above. Defendant shall pay One Thousand, Five Hundred Dollars ($1,500.00) for each Action Plan submitted to LA Waterkeeper pursuant to Paragraph 43 above. Payments are due at the same time that the Advanced Treatment Plan and/or applicable Action Plan is submitted and shall be made to "Los Angeles Waterkeeper" via certified mail, return receipt requested to Los Angeles Waterkeeper, c/o Barak Kamelgard, 360 E 2nd Street Suite 250, Los Angeles, CA 90012. Failure to submit a payment as required under this Paragraph will constitute a breach of the Consent Decree. Visual Observations

49. <u>Storm Water Discharge Observations</u>. During the Term, appropriately trained staff of Defendant shall conduct visual observations during the Facility's operating hours during every rain event. Such inspections shall comply with all requirements of Section XI.A.2 of the General Permit, and any successor thereof.

50. <u>Monthly Visual Observations</u>. During the Term, appropriately trained staff of Defendant shall conduct monthly non-storm water visual observations of the Facility. Such inspections shall comply with all requirements of General Permit § XI.A.1, and any successor thereof. Such monitoring shall include outfalls, Discharge Points, outdoor industrial equipment and storage areas, outdoor industrial activities areas, BMPs, and all other potential sources of industrial pollutants. All Discharge

Points shall also be inspected for accumulation of dust, sediment, sand, grit, oily substances, oily sheens upon any standing water, and other materials associated with operations at the Facility. During the Wet Season, such inspections shall further include observations of all storm water BMPs that are used only during the Wet Season at the Facility to ensure that operational BMPs are being implemented, structural BMPs are in good condition or working order, and that BMPs have been effective in producing clean conditions at the Facility. Such inspections shall further include observation as to whether there are any non-storm water discharges from the Facility.

51. <u>Visual Observations Records</u>. Defendant shall maintain observation records, including photographs, to document compliance with Paragraphs 49 and 50. Such records shall include, but not be limited to, the persons who completed the inspection, the date of the inspection, and notes sufficient to describe the completed activity and all observations thereof, including but not limited to: (i) whether BMPs are in an adequate condition; (ii) whether any repair, replacement, or operation and maintenance is needed for any BMPs; (iii) other conditions that have the potential to lead to pollutant loading in storm water discharges; and (iv) photographs of all the foregoing. Defendant shall provide LA Waterkeeper with a copy of those records within fourteen (14) days of receipt of a written request from LA Waterkeeper for those records.

52. <u>Employee Training Program</u>. Within thirty (30) days of the Effective Date, Defendant shall develop and implement an employee training program that meets the following requirements and ensures (1) that there is a sufficient number of employees at the Facility designated to achieve compliance with the General Permit and this Consent Decree ("Designated Employees"), and (2) that these Designated Employees are properly trained to perform the activities required by the General Permit and this Consent Decree ("Training Program"):

a. <u>Training Materials</u>. Training materials should include, at minimum, a detailed Training Manual or Standard Operating Procedure, including drawings and diagrams where appropriate, for reference and use by Defendant's personnel to ensure effective implementation of all BMPs at the Facility;

b. <u>Language</u>. The training and training materials shall be available and offered in the language(s) in which relevant employees are fluent. If necessary, Defendant shall provide a translator or translators at all trainings where such translation is likely to improve staff comprehension of the Training Program and improve compliance with this Consent Decree and the General Permit;

c. <u>Staff Training</u>. Training shall be provided by a QISP familiar with the requirements of this Consent Decree and the General Permit, and shall be repeated as necessary to ensure that all relevant employees are familiar with the requirements of this Consent Decree, the Permit, and the Facility's SWPPP. All relevant new staff shall receive this training before assuming responsibilities for implementing the SWPPP;

d. <u>Sampling Training</u>. Defendant shall designate an adequate number of employees necessary to collect storm water samples as required by this Consent Decree, including training to ensure samples are properly collected, stored, and submitted to a certified laboratory;

e. <u>Visual Observation Training</u>. Defendant shall provide training on how and when to properly conduct visual observations to Designated Employees;

f.   <u>Non-Storm Water Discharge Training</u>. Defendant shall train all Designated Employees at the Facility on the General Permit's prohibition of non-storm water discharges, so that Designated Employees know what non-storm water discharges are and how to detect and prevent non-storm water discharges;

g.   <u>Employees</u>: All Designated Employees at the Facility shall participate in the Training Program annually. New Designated Employees shall participate in the Training Program within thirty (30) days of their hiring date; and

h.   <u>Recordkeeping</u>: Defendant shall maintain training records to document compliance with this Paragraph and shall provide LA Waterkeeper with a copy of these records within fourteen (14) days of receipt of a written request.

### G. STORMWATER POLLUTION PREVENTION PLAN

53.   <u>Interim SWPPP Revisions</u>: Defendant shall amend the Facility's SWPPP to incorporate the requirements in this Consent Decree and comply with the General Permit and submit the complete, updated SWPPP to LA Waterkeeper by thirty days after the Effective Date, for LA Waterkeeper's review and comment who shall provide any comments to Royal White within thirty (30) days.

54.   The updated SWPPP shall reflect the storm water pollution control measures set out in Paragraphs 14-30.

55.   The complete, updated SWPPP shall contain, at a minimum, the following elements as necessary:

a.   A revised pollutant source assessment, including all elements required by section X.G of the General Permit as well as assessments of the potential for the Facility's storm water

discharges to contain pollutants for which the Receiving Waters are 303(d) listed and/or have Total Maximum Daily Loads;

    b.   A detailed narrative description of each industrial activity with the potential to impact storm water quality occurring at the Facility as required by section X.G of the General Permit;

    c.   Descriptions of all BMPs in accordance with section X.H.4 of the General Permit, including without limitation BMPs required by this Consent Decree;

    d.   A set of site maps that comply with section X.E of the General Permit and provisions of this Consent Decree;

    e.   A MIP as required by sections XI and X.I of the General Permit;

    f.   A designation (by position/title) of employees responsible for carrying out storm water management, monitoring, sampling and SWPPP implementation, e.g., visual inspection of each specific area, monitoring each specific BMP, sampling, etc.; and

    g.   A Training Program as described above at Paragraph 52.

56. <u>Additional SWPPP Revisions</u>: On or before October 1, 2024, Royal White shall revise and update its SWPPP to incorporate any additional storm water pollution control measures implemented at the Site.

57. Within thirty (30) days after approval of any Action Plan by LA Waterkeeper (or resolution pursuant to Dispute Resolution), Defendant shall revise the then-current SWPPP to reflect the changes required by the Action Plan and submit the complete, updated SWPPP to LA Waterkeeper for LA Waterkeeper's review and comment.

58. Within thirty (30) days after any changes in industrial activities, sources of industrial pollutants, changes to Discharge Points, or changes to sections of the SWPPP identified in the SWPPP as requiring a SWPPP revision (including but not

limited to, changes in Facility contacts or PPT members, changes or additions of BMPs, or changes in or additions of industrial activities that impact storm water discharge), Defendant shall revise the then-current SWPPP to reflect such changes and submit the complete, updated SWPPP to LA Waterkeeper for LA Waterkeeper's review and comment.

59.  SWPPP Review:  For any SWPPP updates pursuant to Paragraphs 53-58, LA Waterkeeper shall have thirty (30) days upon receipt of Defendant's complete SWPPP to provide Defendant with comments. Within thirty (30) days of receiving LA Waterkeeper's comments and proposed changes to the SWPPP, Defendant shall consider each of the comments and proposed changes and either accept them or justify in writing why a change is not incorporated. The Parties agree to work in good faith to resolve any disputes with respect to the SWPPP, and any remaining disputes will be resolved through timely initiation of the dispute resolution procedures in Section IV below. Following its incorporation of proposed modification or additions (if any) into each revised SWPPP, Defendant shall upload the SWPPP to SMARTS.

**H.  COMPLIANCE MONITORING AND REPORTING**

60.  LA Waterkeeper may conduct two site inspections during the 2024-2025 Reporting Year: once following (a) the complete implementation of all the interim storm water pollution control measures set out in Paragraphs 14-26 and once following (b) the complete implementation of all the permanent storm water pollution control measures set out in Paragraphs 27-30. LA Waterkeeper may then conduct one annual site inspection ("Site Inspection") during each subsequent Reporting Year during the Term for the purpose of ensuring compliance with this Consent Decree and the General Permit. In the event of a dispute regarding Defendant's compliance with this Consent Decree, and provided a Site Inspection would be relevant to resolving the Parties' dispute, the Parties agree to meet and confer regarding one additional Site Inspection at Plaintiff's request. Plaintiff shall not unreasonably

request, and Defendant shall not unreasonably deny, one additional Site Inspection.
Irrespective of the number of prior site inspections within a given year, LA
Waterkeeper may conduct an additional Site Inspection upon notification of Royal
White intention to file a NOT pursuant to Paragraph 11.r.iv. of this Consent Decree.
Any Site Inspection shall occur during normal business hours, and LA Waterkeeper
will provide Defendant with at least seventy-two (72) hours' notice prior to a Site
Inspection and during the Dry Season and at least forty-eight (48) hours' notice
during the Wet Season. LA Waterkeeper may have no more than a total of three (3)
persons present for any Site Inspection. For any Site Inspection requested to occur in
wet weather, Plaintiff shall be entitled to adjust timing or reschedule during normal
business hours in the event the forecast changes and anticipated precipitation appears
unlikely, and thus frustrates the purpose of visiting the Facility in wet weather. Notice
will be provided by electronic mail to the individual(s) designated below at Paragraph
86. During the Wet Weather inspection, Plaintiff may request that Defendant collect a
duplicate sample of industrial storm water discharge from the Facility's designated
industrial discharge point(s) referenced in its SWPPP, to the extent that such
discharges are occurring and it is a QSE. Defendant shall collect their sample and a
second sample for LA Waterkeeper. LA Waterkeeper's representative(s) may observe
the split sample(s) being collected by Defendant's representative. LA Waterkeeper
shall be permitted to take photographs or video recording during any Site Inspection.
If LA Waterkeeper collects duplicate samples, it shall pay for such samples.  Any
duplicate samples collected by LA Waterkeeper cannot be used as evidence of an
exceedance or violation of this Consent Decree.

     61.  Document Provision. During the Term, Defendant shall notify and
submit documents to LA Waterkeeper as follows:

          a.  Defendant shall provide to LA Waterkeeper all compliance
             documents, monitoring and/or sampling data, written

communications and/or correspondences, or any documents related to storm water quality at the Facility that are submitted to the Regional Board, the State Board, and/or any state or local agency, county or municipality within fourteen (14) business days;

b. Within fourteen (14) business days of receipt by Defendant, send to LA Waterkeeper any compliance document, inspection report, written communication and/or correspondence, or any document related to storm water quality at the Facility received by Defendant from the Regional Board, the State Board, and/or any state or local agency, county, municipality. Defendant shall mail paper copies or email electronic copies of documents to LA Waterkeeper at the relevant notice address contained below.

c. Any documents, communications and/or correspondence uploaded to SMARTS regarding the Facility constitutes notification under this Consent Decree and need not be separately provided to Plaintiff.

62. <u>Compliance Monitoring</u>. Defendant agrees to partially defray costs associated with Plaintiff's monitoring of Defendant's compliance with this Consent Decree during the Term by paying Fifteen Thousand Dollars ($15,000.00). Payment shall be made within thirty (30) days of the Effective Date. The payment shall be made payable to: Sycamore Law Inc., Attorney Client Trust Account and delivered by overnight carrier to 1004 O'Reilly Avenue, San Francisco, CA 94129. Failure to submit payment as required under this Paragraph will constitute breach of the Consent Decree.

**I. ENVIRONMENTAL MITIGATION, LITIGATION FEES AND COSTS, STIPULATED PENALTIES, PAYMENTS AND INTEREST**

63. <u>Environmental Mitigation Project</u>. To fund environmental project activities that will reduce or mitigate the impacts of storm water pollution from

industrial activities occurring in the Los Angeles and Long Beach Harbors and San Pedro Bay, Defendant agrees to make a payment totaling Thirty-Two Thousand and Five Hundred dollars ($32,500.00) to the Rose Foundation made within thirty (30) days of the Effective Date, payable to the Rose Foundation for Communities and the Environment and sent via overnight mail to Rose Foundation, 201 4th Street, Suite 102, Oakland, CA 94607. Failure to submit payment as required under this Paragraph will constitute breach of the Consent Decree.

64. <u>LA Waterkeeper's Fees and Costs</u>. Defendant agrees to pay a total of One Hundred Twenty-Seven Thousand and Five Hundred dollars ($127,500.00) to LA Waterkeeper to partially reimburse Plaintiff for their investigation fees and costs, expert/consultant fees and costs, reasonable attorneys' fees and other costs incurred as a result of investigating and filing the lawsuit, and negotiating a resolution of this matter, within thirty (30) days of the Effective Date. The payment shall be made payable to: Sycamore Law Inc., Attorney Client Trust Account and delivered by overnight carrier to 1004 O'Reilly Avenue, San Francisco, CA 94129. Failure to submit payment as required under this Paragraph will constitute breach of the Consent Decree.

65. <u>Interest on Late Payments</u>. Defendant shall pay interest on any payments, fees, or costs owed pursuant to this Consent Decree that are not received by the due date. The interest shall accrue starting the next business day after the payment is due and shall be computed at a rate equal to the lower of: (i) 10% per year (0.833% per month); or (ii) the maximum rate permitted by applicable law. Interest shall continue to accrue daily on any outstanding balance until Defendant is current on all payments then due under this Consent Decree, and shall be paid at the same time that the payments, fees, or costs owed are paid to LA Waterkeeper. Interest on late payments shall be paid by check payable to: Rose Foundation for Communities and the Environment, and such funds shall be used for the sole purpose of funding

environmentally beneficial projects, as described in Paragraph 63. Payment shall be sent via overnight mail to Rose Foundation, 201 4th Street, Suite 102, Oakland, CA 94607.

## IV.    DISPUTE RESOLUTION

66.   This Court shall retain jurisdiction over this matter for the term for the purposes of enforcing its terms and conditions, and adjudicating all disputes among the parties that may arise under the provisions of this Consent Decree. The Court shall have the power to enforce this Consent Decree with all available legal and equitable remedies, including contempt.

67.   <u>Meet and Confer</u>. Either party to this Consent Decree may invoke the dispute resolution procedures of this Section IV by notifying the other party in writing of the matter(s) in dispute and of the disputing party's proposal for resolution. The Parties shall then meet and confer in good faith (either telephonically or in person) within ten (10) days of the date of the notice in an attempt to fully resolve the dispute no later than thirty (30) days from the meet and confer.

68.   <u>Settlement Conference</u>. If the Parties cannot resolve the dispute within thirty (30) days of the meet and confer described in Paragraph 67 the Parties shall request a settlement meeting or conference before a mutually agreed upon mediator. In the event the Parties cannot fully resolve such dispute within ninety (90) calendar days of the meet and confer described in Paragraph 67, the Parties agree that the dispute may be submitted for formal resolution by filing a motion before the United States District Court for the Central District of California. The Parties agree to request an expedited hearing schedule on the motion.

69.   In resolving any dispute arising from this Consent Decree before the Court, the prevailing Party shall be entitled to seek fees and costs incurred pursuant to the provisions set forth in Section 505(d) of the Clean Water Act, 33 U.S.C. §

1365(d), and applicable case law interpreting such provisions, or as otherwise provided for by statute and/or case law.

## V.  MUTUAL RELEASE OF LIABILITY AND COVENANT NOT TO SUE

70.  <u>Plaintiff's Waiver and Release of Defendant</u>. In consideration of the above, upon the Effective Date of this Consent Decree, Plaintiff, on its own behalf and on behalf of its officers and directors, release Defendant, its officers, directors, managers, employees, members, parents, subsidiaries, divisions, affiliates, predecessors, successors or assigns, agents, attorneys and consultants and other representatives, from and waives all claims that were or could have been raised in the 60-Day Notice Letter and/or the Complaint up to and including the Termination Date of this Consent Decree.

71.  <u>Defendant's Waiver and Release of Plaintiff</u>. In consideration of the above, upon the Effective Date of this Consent Decree, Defendant, on its own behalf and on behalf of its officers, directors, employees, parents, subsidiaries, affiliates and each of their successors or assigns, release Plaintiff, its officers and directors, managers, employees, members, parents, subsidiaries, divisions, affiliates, predecessors, successors or assigns, agents, attorneys and consultants and other representatives, from and waives all claims related to the 60-Day Notice Letter and/or the Complaint up to and including the Termination Date of this Consent Decree.

72.  Nothing in this Consent Decree limits or otherwise affects Plaintiff's rights to address or take any position that it deems necessary or appropriate in an informal or formal proceeding before the State Board, Regional Board, EPA, or any other judicial or administrative body on any matter relating to Defendant's compliance at the Facility with the General Permit or the Clean Water Act occurring or arising after the Effective Date.

## VI.    MISCELLANEOUS PROVISIONS

73.   <u>No Admission of Liability</u>. The Parties enter into this Consent Decree for the purpose of avoiding prolonged and costly litigation. Neither the Consent Decree nor any payment pursuant to the Consent Decree shall constitute or be construed as a finding, adjudication, or acknowledgement of any fact, law or liability, nor shall it be construed as an admission of violation of any law, rule, or regulation. Defendant maintains and reserves all defenses it may have to any alleged violations that may be raised in the future.

74.   <u>Counterparts</u>. This Consent Decree may be executed in any number of counterparts, all of which together shall constitute one original document.  Telecopy and/or facsimile copies of original signature shall be deemed to be originally executed counterparts of this Consent Decree.

75.   <u>Authority</u>. The undersigned representatives for Plaintiff and Defendant each certify that s/he is fully authorized by the party whom s/he represents to enter into this Consent Decree. A Party's signature to this Consent Decree transmitted by facsimile or electronic mail shall be deemed binding.

76.   <u>Construction</u>. The language in all parts of this Consent Decree shall be construed according to its plain and ordinary meaning, except as to those terms defined in the Permit, the Clean Water Act, or specifically herein. The captions and paragraph headings used in this Consent Decree are for reference only and shall not affect the construction of this Consent Decree.

77.   <u>Full Settlement</u>. This Consent Decree constitutes a full and final settlement of this matter.

78.   <u>Integration Clause</u>. This is an integrated Consent Decree. This Consent Decree is intended to be a full and complete statement of the terms of the agreement between the Parties and expressly supersedes any and all prior oral or written

agreements, covenants, representations, and warranties (express or implied) concerning the subject matter of this Consent Decree.

79. <u>Severability</u>. In the event that any provision, paragraph, section, or sentence of this Consent Decree is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

80. <u>Choice of Law</u>. The laws of the United States shall govern this Consent Decree.

81. <u>Diligence</u>: Defendant shall diligently file and pursue all required permit applications for any required BMPs and shall diligently procure contractors, labor, and materials needed to complete all BMPs by the required deadlines.

82. <u>Negotiated Settlement</u>. The Settling Parties have negotiated this Consent Decree, and agree that it shall not be construed against the party preparing it, but shall be construed as if the Settling Parties jointly prepared this Consent Decree, and any uncertainty and ambiguity shall not be interpreted against any one party.

83. <u>Modification of the Consent Decree</u>. This Consent Decree, and any provisions herein, may not be changed, waived, discharged, or terminated unless by a written instrument, signed by the Parties and approved by the Court. Any request to modify any provision of the Consent Decree, including but not limited to any deadline(s) set forth herein, must be made in writing at least fourteen (14) days before the existing deadline(s) applicable to the provision(s) proposed to be modified.

84. <u>Assignment</u>. Subject only to the express restrictions contained in this Consent Decree, all of the rights, duties and obligations contained in this Consent Decree shall inure to the benefit of and be binding upon the Parties, and their successors and assigns. Defendant shall notify Plaintiff within ten (10) days of any assignment.

85. <u>Force Majeure</u>. Neither of the Parties shall be considered to be in default in the performance of any of their respective obligations under this Consent Decree

when performance becomes impossible due to a Force Majeure event. A Force Majeure event is any circumstance beyond a Settling Party's control, including without limitation, any act of God, war, fire, earthquake, flood, windstorm, pandemic, public health crisis, or natural catastrophe; criminal acts; civil disturbance, vandalism, sabotage, or terrorism; restraint by court order or public authority or agency; or action or non-action by, or inability to obtain the necessary authorizations or approvals from any governmental agency. A Force Majeure event shall not include normal inclement weather, economic hardship, inability to pay, or employee negligence. Any party seeking to rely upon this Paragraph to excuse or postpone performance shall have the burden of establishing that it could not reasonably have been expected to avoid the Force Majeure event and which by exercise of due diligence has been unable to overcome the failure of performance. The Parties shall exercise due diligence to resolve and remove any Force Majeure event.

86. <u>Correspondence</u>. All notices required herein or any other correspondence pertaining to this Consent Decree shall be, the extent feasible, sent via electronic mail transmission to the e-mail address listed below, or if electronic mail is not feasible, then by certified U.S. mail with return receipt, or by hand delivery to the following addresses:

| If to Plaintiff: | If to Defendant: |
|---|---|
| Los Angeles Waterkeeper | Royal White Cement, Inc. |
| Barak Kamelgard | Antonios Fady |
| Benjamin Harris | 14601 Bellaire Blvd. |
| Madeleine Siegel | Houston, TX 77083 |
| 360 E 2nd St., Suite 250 | Email: |
| Los Angeles, CA 90012 | Antonios@royalwhitecement.com |
| Email: barak@lawaterkeeper.org | |
| Email: ben@lawaterkeeper.org | |
| Email: madeleine@lawaterkeeper.org | |
| Phone: (310) 394-6162 | |

With copies to:
Daniel G. Cooper (SBN 153576)
Daniel@sycamore.law
Jesse C. Swanhuyser (SBN 282186)
jesse@sycamore.law
Jessica D. Hollinger (SBN 344211)
jessica@sycamore.law
SYCAMORE LAW, INC.
1004 O'Reilly Avenue, Ste. 100
San Francisco, CA 94129
Tel: (415) 360-2962

With copies to:
Lauren Berger (SBN 136149)
lb@svlg.com
Edward A. Kraus (SBN 162043)
eak@svlg.com
Silicon Valley Law Group
1 North Market Street, Suite 200
San Jose, CA 95113
Tel: (408) 573-5700

Notifications of communications shall be deemed submitted three (3) days after the date that they are postmarked and sent by first-class mail, or immediately after acknowledgement of receipt via email by the receiving party. Any change of address or addresses shall be communicated in the manner described above for giving notices.

87.    If for any reason the Federal Agencies should object to entry of this Consent Decree or to any portion of this Consent Decree or the District Court should decline to approve this Consent Decree in the form presented, the Parties shall use their best efforts to work together to modify the Consent Decree within thirty (30) days so that it is acceptable to the Federal Agencies or the District Court. If the Parties are unable to modify this Consent Decree in a mutually acceptable manner that is also acceptable to the District Court, this Consent Decree shall immediately be null and void as well as inadmissible as a settlement communication under Federal Rule of Evidence 408 and California Evidence Code section 1152.

The Parties hereto enter into this Consent Decree and submit it to the Court for its approval and entry as a final judgment.

IN WITNESS WHEREOF, the undersigned have executed this Consent Decree as of the date first set forth below.

---

CONSENT DECREE                37                Case No. 2:23-cv-08983

APPROVED AS TO CONTENT

Dated: September 26, 2024                    By: _____
                                                 Bruce Reznik
                                                 Executive Director
                                                 Los Angeles Waterkeeper

Dated: September 30, 2024                    By: _Antonios Fady_____
                                                 Antonios Fady
                                                 General Counsel
                                                 Royal White Cement Inc.

APPROVED AS TO FORM

                                             SYCAMORE LAW, INC.

Dated: September 26, 2024                    By: _____
                                                 Daniel Cooper
                                                 Attorney for Plaintiff
                                                 Los Angeles Waterkeeper

Dated: September 30, 2024                    By: _____
                                                 [DEFENDANT COUNSEL NAME]
                                                 Attorney for Defendant
                                                 [DEFENDANT]

**IT IS SO ORDERED.**
**FINAL JUDGMENT**

Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment between the Plaintiff and Defendant.

Dated: _____11/12/2024_____          CENTRAL DISTRICT OF CALIFORNIA



_____

Margo A. Rocconi
United States Magistrate Judge